## HATCH v. HATCH.

No. 2688.   Decided May 6, 1915 (148 Pac. 1096).

1. COMMON LAW—HUSBAND AND WIFE—PROPERTY OF WIFE—ADOP-
   TION BY TERRITORY—STATUTE.   When Congress, in 1850, by adopt-
   ing the Organic Act for the government of the territory, pro-
   vided in the last section that the Constitution and laws of the
   United States were thereby extended over the territory so far
   as the same might be applicable, that system was extended
   which generally prevailed in the country, and the old English
   common law, with its rigorous limitations imposed upon women
   by the status of marriage, was not adopted, but only so much
   thereof as was applicable to the conditions of the new terri-
   tory, which recognized the equitable right of a married woman
   to a separate estate.[1]   (Page 127.)

2. HUSBAND AND WIFE—PROPERTY OF WIFE—RECOVERY—LACHES OF
   WIFE.   Where the administrator of a wife sued to recover from
   the executors of her husband's property alleged to have been the
   wife's separate estate, and where the delay in asserting the right
   was less than the period of limitations, and it did not appear
   that the delay worked any disadvantage, dismissal of the com-
   plaint on the ground of laches was improper.[2]   (Page 129.)

3. LIMITATION OF ACTIONS—PROPERTY OF WIFE—RECOVERY—PLEAD-
   ING.   Where an administrator of a wife sued the executors of
   her husband to recover property alleged to be her separate es-
   tate, and the allegations of the complaint, while showing lapse
   of time in excess of the statute of limitations, set up no demand
   and refusal, ouster, hostile assertion, or holding on the part of
   the husband against the wife, while asserting cotenancy, the
   married relation, and other trust or fiduciary relations against
   which the limitations do not run until demand and refusal,
   ouster, or open repudiation, the complaint was not demurrable.
   (Page 129.)

4. LIMITATION OF ACTIONS—SUSPENSION OF STATUTE—DEATH AND
   ADMINISTRATION—EFFECT.   Causes of action which accrue to the

---

[1]First National Bank v. Kinner, 1 Utah, 100; Adams v. Union Pa-
cific Railroad Co., 1 Utah, 232; Henderson v. Adams, 15 Utah, 30, 48
Pac. 398; Hilton v. Thatcher, 31 Utah, 360, 88 Pac. 20; People v.
Green, 1 Utah, 11.

[2]Hamilton v. Dooly, 15 Utah, 280, 49 Pac. 769.

administrator after the death of an intestate are not complete
and do not exist, so that limitations can begin to run upon them
until the administrator is appointed who can bring suit.   (Page
130.)

5.  EXECUTORS AND ADMINISTRATORS—CLAIMS—PRESENTMENT—STAT-
    UTE.  Suit by the administrator of a wife against the executors
    of her husband to recover her separate estate was not of such
    character as to require presentment of claims to such executors
    within the provisions of the probate laws.   (Page 131.)

Appeal from District Court, Fourth District; *Hon. A. B.
Morgan,* Judge.

Suit by Joseph Hatch, as administrator of the estate of
Permelia Jan Hatch, against Ruth Hatch and Abram C. Hatch
as executors of Abram Hatch.

Judgment sustaining demurrers to the complaint.   Plaintiff
appeals.

REVERSED, AND CAUSE REMANDED, with directions.

*W. S. Willes, J. W. N. Whitecotton,* and *E. A. Walton,*
attorneys for appellant.

*Chas. Hatch, Rawlins, Ray and Rawlins,* for respondent.

STRAUP, C. J.

This is a case in equity.   It went off on demurrers to the
complaint.   The ruling is presented for review.

The plaintiff's intestate and the defendants' testate were
husband and wife.   She died in November, 1880.   An admin-
istrator of her estate was not appointed until in January,
1912.   He died in December, 1911.   In January, 1912, the
defendants were appointed executors of his estate.   They left
children surviving them, who at the death of plaintiff's in-
testate, were twenty-six, twenty-three, twenty, seventeen and
nine years of age.   The complaint is in four counts.   We shall
refer to only so much of it as is necessary to a proper consid-
eration of the questions involved.   The first proceeds on the

theory that the wife at her death was, and for many years prior thereto had been, ''the owner of an undivided interest and share of certain partnership business or joint adventure known as the Heber Co-operative Mercantile Institution, and sometimes known as Abram Hatch & Co.'s store, which business consisted of general merchandising, money loaning, and the ownership of real and personal property, good will, and other things incidental to a co-operative store''; that he was a co-owner with her in the business, and that ''at the time of the death of plaintiff's intestate and up to the time of'' his death ''all of said property was in the actual possession and control of'' him, and that he ''took, held, and retained the same as surviving partner of plaintiff's intestate''; that in March, 1888, he assigned, transferred, and made over, all the property, assets, stock, and good will of the partnership or joint adventure, to a corporation, receiving therefor 1,400 shares of the capital stock of such corporation; that he, at the time of his death, held of such shares 1,050 shares, which thereafter, and at the commencement of the action, were in the possession and under the control of the defendants; that dividends on the stock had been paid to and received by him, and after his death to the defendants, but that neither accounted for the same, and that those paid to him augmented his estate, and those paid to the defendants were held by them ''in specie.''

In the second cause it is alleged that in November, 1880, the plaintiff's intestate was the owner of $120, which was recognized by the defendants' testate as a portion of her separate estate; that she then ''placed the same into his hands and possession, with instructions and upon the agreement to purchase for her twelve shares of stock'' of another corporation, and that he, in June, 1881, with such moneys purchased twelve shares of such stock, taking the certificate in his own name. Then it is alleged that dividends were paid upon that stock, which were received by him, and not accounted for, that he was possessed of such stock at the time of his death, and that the same at the commencement of the action was in the possession of the defendants.

In the third cause it is alleged that plaintiff's intestate at

all times during the marriage "was possessed of a separate
estate," and "during all said time the existence of said sep-
arate estate was recognized by the defendants' testate," and
that "in respect of their business dealings and relations they
dealt the one with the other independently as one stranger
with another; that during the years 1877 and 1878 plaintiff's
intestate and defendans' decedent were equal owners and ten-
ants in common of large numbers of cattle, and while so equal
owners of said cattle and during said years" he "sold there-
from a large part, and received therefor the sum of $16,200,
one-half of which belonged to the plaintiff's intestate"; that at
the time of her death she and he "were the equal owners
and tenants in common of a large herd of cattle, and there-
after and in the year 1882" he "sold a large number thereof
and received the sum of $28,000;  *  *  *  that no account-
ing of payments in respect of said property and money has
ever been made to" plaintiff's intestate, "or her estate, or
the beneficiaries thereof, but, on the contrary, said property
and money were retained by him, and reinvested by him, and
the proceeds and increments arising therefrom reinvested and
transmuted into other property, which defendants' decedent
had standing in his name at the time of his death, and the
same has come into and now is in the possession of the defend-
ants."

In the fourth count it is averred that during the subsistence
of the marriage relation he "continuously dealt with and
treated plaintiff's intestate in respect of her property rights
as a *feme sole,* and as being under no disability by reason of
her marriage in respect of her personal earnings and personal
property, and at various times entered into and engaged in
joint adventures and partnerships with her as if a stranger";
that in September, 1867, she "was the owner in her own right
of $8,000 in money, a portion of her separate estate, which was
turned over and delivered and intrusted to" him "as her
agent for the purpose of purchasing" certain goods and mer-
chandise for her; that with such moneys such goods were pur-
chased by him and placed in stock in which they had a joint
interest, and which later was transferred from Lehi to Heber
City, and that the proceeds thereof were received  by him

and from time to time reinvested, and which property, together with the increments, was, at the time of her death, taken into his exclusive possession, and was held and retained by him at the time of his death, and which thereafter came into, and at the commencement of the action was in, the possession of the defendants.

In all of them it is alleged that under the law he, during his lifetime, was entitled to the income of one-fourth of all the property and interest owned and possessed by plaintiff's intestate, but that he, after her death, held and retained possession of the whole of her property and interest, and that he thereupon became and was a tenant in common with the beneficiaries and surviving heirs of plaintiff's intestate. In all of them it also is alleged that claims were presented to the defendants, as executors, but that each and all were rejected by them. There are also other allegations respecting relations of tenants in common, trust, and other fiduciary relations. In each there is prayer for an accounting and for equitable relief.

To all of these counts demurrers were interposed on grounds of insufficient facts, laches, and the statute of limitations, ambiguity, defect of parties, misjoinder of actions, and of variance between the claims presented and causes stated. Those chiefly urged are the first two. It is claimed no cause of action is stated in either count, because at all times stated in the complaint the English common law was in force in the territory, and that thereunder the legal existence of the wife was suspended and was merged in that of her husband, and thus she was incapabale of owning, holding, or acquiring property, and that whatever property she may have had became his on the marriage and was his at the time of her death; and hence the allegations that she had a separate estate and was the owner of property at the time of her death are incompatible with law, and therefore must be disregarded.

Much is said in the briefs by appellants that the civil law, and by respondents that the English common law, was in force in the territory during all the times stated in the complaint. Utah is of territory which, in 1846, passed from the possession of Mexico into that of the United States by the

treaty of Guadalupe Hidalgo, which terminated the Mexican War. The original territory so acquired embraced the region west of the summit of the Rock Mountains, east of California, and between the thirty-seventh and forty-second parallels of north latitude. At the time of the treaty and cession the civil law prevailed in the republic of Mexico. It continued to so prevail in the acquired and ceded territory until changed by the new sovereign. *Botiller* v. *Dominguez*, 130 U. S. 238, 9 Sup. Ct. 525, 32 L. Ed. 926; 1 Story on the Constitution, Section 150. A provisional government was established in the territory by its people in 1849. There is nothing in that to show that the English common law was established by them. In 1850 Congress created the acquired territory into a temporary government by the name of the Territory of Utah, and passed what is known as the Organic Act for the territorial government of Utah Territory. Later Nevada, portions of Idaho, and of Wyoming and Colorado, and other territory, were carved out of Utah Territory. The last section of the act reads:

"That the Constitution and laws of the United States are hereby extended over and declared to be in force in said Territory of Utah so far as the same or any provision thereof may be applicable."

By that it is claimed on the one side, and denied on the other, that Congress extended over or transplanted the English common law into the territory so acquired from Mexico. There are no other enactments on the subject, either by Congress, the territorial Assembly, or the state Legislature of Utah, until 1898, when the state Legislature adopted this (R. S. 1898):

"The common law of England, so far as it is not repugnant to or in conflict with the Constitution and laws of the United States, or the Constitution or laws of this state, shall be the rule of decision in all the courts of this state."

Not until then was the common law of England adopted in this territory or state by any positive enactment. In California, where, too, its territory was originally acquired from Mexico, it was held that the civil law prevailed until the adoption of the common law by the first session of the Legislature

in 1850. *Norris* v. *Moody et al.*, 84 Cal. 145, 24 Pac. 37. So, too, in Colorado. That court in *Herr* v. *Johnson*, 11 Colo. 393, 18 Pac. 342, said:

"The common law of England had never obtained in this portion of the North American continent previous to its acquisition by our general government. This portion of our country was never under British dominion. The acquisition thereof was by treaty and purchase long after the Revolution, and from powers not having the common law, but the civil law; so that first the foothold or actual existence of the common law of England here was necessarily by legislative enactments, and necessarily limited according to the expression of such enactments."

In *Ward* v. *Broadwell*, 1 N. M. 75, the court said:

"The treaty of peace, by the cession of New Mexico to the United States, changed the jurisdiction and sovereignty over this territory from the republic of Mexico to the United States. But it had no effect, nor was it intended to have any effect, upon the system of government prevailing or laws in force at the time of the cession. It has been well settled by the authority of adjudged cases that the laws, usages, and municipal regulations in force at the time of the conquest or cession remain in force until changed by the new sovereign."

This is not disputed. But the language of the Organic Act is pointed to as an enactment adopting in the Territory of Utah the English common law. The decisions as to this are, to say the least, confusing, for in most of them what was said on the subject was either dicta or left the matter in doubt. *First National Bank* v. *Kinner*, 1 Utah, 100, is cited as an authority that the English common law was by the Organic Act extended into the territory. Justice Emerson, who wrote the opinion, seemed to entertain the view that it could not be assumed that any specific body of the common law was transplanted into the territory, but that the people of the territory tacitly agreed upon maxims and principles of the common law suited to their conditions and consistent with the "Constitution and laws of the United States." But neither Justice Boreman nor Justice McKean, who participated in the decision, went even that far. Notwithstanding this, Justice Lowe, in *Thomas* v. *U. P. R. R. Co.*, 1 Utah 232, declared that

the Bank-Kinner Case unqualifiedly decided "that the common law was a part of this territory." So, in *Henderson* v. *Adams*, 15 Utah 30, 48 Pac. 398, was it assumed that the common law, in a way and to an extent, was in force in the territory. But the opinion is guarded, for the court had in hand a rule—the statute of uses—confessedly not a part of the English common law. That may also be said of the two preceding cases. In *Hilton* v. *Thatcher*, 31 Utah 360, 88 Pac. 20, it is declared:

"The common law has been in force in the state of Utah at all times since the Organic Act of 1850."

*People* v. *Green*, 1 Utah 11, is cited as an authority for that. In the Green Case a conviction was claimed to be bad because the grand jury finding the indictment was not selected as provided by the territorial laws. Justice Drummond held it good, on the ground that the procedure adopted by the territorial Legislature respecting the selection of a grand jury was in conflict with the Organic Act, and for that reason bad. But that was repudiated by the Supreme Court of the United States in the case of *Clinton* v. *Englebrecht,* 13 Wall. 434, 20 L. Ed. 20. The *Hilton-Thatcher Case,* restricted to the question before the court, is well considered and grounded, and properly decided. That is not doubted. The case involved questions of marriage relations between one Park and a Mrs. Hilton, and her alleged rights as a widow in and to real property possessed and conveyed to him during coverture. They were married in December, 1872. He died in 1900. She, as his widow, claimed an interest in real property possessed and conveyed by him in 1888 without her release or joining in the conveyance. The determination of the case largely depended upon the acts of the territorial Assembly, of Congress, and of the state, principally the territorial act of February, 1872 (Comp. Laws 1876, p. 342), the congressional act of 1887 (Comp. Laws 1888, p. 119), and acts of the state Legislature of 1898 (Rev. Stat. 1898, Section 2826), relating to married women. They all are referred to in the opinion. True, we assumed—all the members of the court did—that the common law, except as modified by legislative

enactment, was in force in the territory in 1888, when the conveyance was made. But that was unnecessary to the decision, for the congressional act of 1887 provided that:

"A widow shall be endowed of third part of all the lands whereof her husband was seized of an estate of inheritance at any time during the marriage, unless she shall have lawfully released her right thereto."

And from a reading of the opinion it is apparent that what was awarded the widow was grounded on congressional acts and statutory provisions, and not on common law rules. Perhaps the Supreme Court of the United States best put the matter in the case known as *Mormon Church* v. *United States,* 136 U. S. 62, 10 Sup. Ct. 792, 34 L. Ed. 481. There the court said:

"But it is apparent from the language of the Organic Act, which was passed September 9, 1850, * * * that it was the intention of Congress that the system of common law and equity which generally prevails in this country should be operative in the Territory of Utah, except as it might be altered by legislation. * * * In view of these significant provisions, we infer that the general system of common law and equity, as it prevails in this country, is the basis of the laws of the Territory of Utah."

This is far from asserting that the common law of England was intended to be extended over or was transplanted into the territory. True, as stated in 8 Cyc. 369:

"The greater part of the common law in the United States is derived from the common or unwritten law of England."

And while in a sense, there is no common law in the United States—for what is common law in one state is not necessarily so in another—yet, when terms are used, "the common law as recognized in the United States," or which "generally prevails in this country," we speak of it and use it in a different sense from that of "the common law of England." *Browning* v. *Browning,* 3 N. M. (Gild.) 659, 9 Pac. 677. This is so, for it is generally recognized that wherever, in this country, the English common law was adopted, it was adopted only so far as new conditions and surroundings rendered it applicable, except where it was adopted by positive enact-

ments. But nowhere in this country, except by positive enactments, was the English common law fixed and immutable; not even in England. Thus, in an early day, Justice Story, in *Van Ness* v. *Pacard*, 2 Pet. 137, 7 L. Ed. 374, said:

"The common law of England is not to be taken in all respects to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright; but they brought with them and adopted only that portion which was applicable to their situation."

This is familiar doctrine. How often has it been applied in this Western country to riparian rights; elsewhere to descent where the civil and not the English common law, was followed; to ancient lights and property rights of a *feme covert* where partly the English common law and partly the civil law was followed. The old English common law was universally rejected in this country, wherever and whenever it was regarded as being repugnant to the spirit of our laws, and when not in conformity with the general policy of our government and institutions. Under the old English common law and the early Roman law, the marital power of the husband was absolute. The wife had no legal existence apart from that of her husband. She could neither acquire nor hold property, and was not capable of doing anything as a *feme sole*. He, on the marriage, became the possessor of her property, and had the right to sell her services and to chastise her. In return, he was made liable for her debts, torts, misdemeanors, and crimes, except treason and murder. During a later period of the Roman law, and under the doctrine of consensual marriage, the husband and wife were regarded as partners. He had the right to choose the domicile, regulate the household expenses, and the right to the custody of the children; but he had no legal control of her actions, nor over her property. She had a legal existence separate and distinct from his, and had the right to own and hold property, to sell and dispose of it, and to manage her own estate and affairs. That doctrine equity recognized and enforced from an early day both in England and in this country.

In 21 Cyc. 1144, it is said:

"In equity, under the influence of the later Roman law, and long before the changes effected by modern legislation, the wife's individual existence was recognized, and her right to enjoy, control, and dispose of her separate estate was enforced through chancery's extraordinary jurisdiction over the property of married women."

Bishop, in his work on the Law of Married Women (Section .16), commenting on the antagonism of the common law and equity respecting rights of married women, remarked:

"It is a curious phenomenon in our jurisprudence, as derived from the mother country, that it should contain two separate and somewhat antagonistic series of principles, the one of which is peculiar to one class of tribunals and the other to another, so that, if a controversy is decided in one class of courts the result will be one way, and if in another class it will be directly the other way. There is no such antagonism between the common law and the law administered in the ecclesiastical courts as between it and equity. Neither between the common law and equity is the antagonism complete; for it is one of the maxims of the tribunals in which the latter is administered, that equity follows the law. The meaning of which maxim may be explained to be that it follows the law in its rules of decision when it does not choose to follow different rules of its own."

At an early day Justice Story, in his work on Contracts (Section 84), repudiated the English common-law rule relating to married women thus:

"In respect to the powers and rights of married women the law is by no means abreast of the age. Here are seen the old fossil footprints of feudalism. The law relating to married women makes every family a barony, a monarchy or a despotism, of which the husband is the baron, king or despot, and the wife the dependent, serf, or slave. That this is not always the fact is not due to the law, but to the enlarged humanity, which spurns the narrow limits of its rules. The progress of civilization has changed the family from a barony to a republic but the law has not kept pace with the advance of ideas and customs. And although public opinion is a check to legal rules on this subject, the rules are feudal and stern, yet the position of woman throughout history serves as a criterion of the freedom of the people of the age. When man shall despise the right which is founded only in might, woman will be free, and stand on an equal level with him, a friend and not a dependent. Unity of man and wife can never be created by law, but by nature; and where there is discord, no legal rules can create harmony. The first step in any reform on this subject is to enable a married woman to hold

property independent of her husband without intervention of a trus-
tee, which is only an awkward and useless form, the tendency of
which is to create ill feelings and distrust between the married per-
sons. No bad result can follow from enabling woman to hold what
is her own; but, while the fact of marriage entitles the husband to
the fortune of the wife, he has her entirely at advantage, and may
abuse his power to her injury. Besides, this rule of law offers in-
ducements perpetually to marriages for money, instead of affection,
and is therefore at variance with good policy as with morals. The
only reasons by which it is supposed are feudal, and are adverse
to the spirit of freedom."

Now, when Congress in 1850 by the Organic Act extended
over the Territory of Utah, and declared to be in force therein,
"the Constitution and laws of the United States," it
is hard to believe that it thereby intended that all the
harshness and rigor of the old English common law
with respect to married women, rendering her a legal non-
entity, incapable of owning, holding, or doing anything, "a
child of her husband, and legally a sister of her own off-
spring," should be and was put in force in the territory, a
doctrine which then fast was becoming obsolete even in Eng-
land, which never was in all its rigor recognized in the United
States, which was wholly unsuited to our civilization and gov-
ernment and our people, and which never was recognized or
enforced in equity either in this country or in England. Our
conclusion, therefore, is that, while Congress, by extending
over the Territory of Utah the Constitution and laws of the
United States, put in force, in the language of the Supreme
Court of the United States, "the system of common law and
equity which *generally prevails in this country,*" yet did not
so extend or transplant the *common law of England,* with all
its rigor and harshness, but only so much of it as was and had
been generally recognized and enforced in this country, and
as is and was suitable to our conditions. There is much to
support the view that when the colonists left Great Britain
they brought with them and adopted, so far as suitable to
their new conditions and surroundings, the usages and cus-
toms then prevailing in Great Britain. There is no good rea-
son, however, for saying that as to those who migrated from
the states and settled in territory never under British domin-

ion. During all the times stated in the complaint, and during the marriage, from 1867 to 1880, the old English common law relating to married women, with all its rigor and harshness, was neither recognized nor enforced in the states. Nearly all of them, in such respect, had laws and married women's acts in controvention of the English common law. Then we look to the legislative enactments of the territorial Assembly. As early as 1852, any person, including a married woman, of age, and of sound mind, was capable of disposing of property by will. Both parents inherited from their children. Husband and wife inherited from each other. As early as 1876, perhaps earlier, at least four years prior to the death of plaintiff's intestate, it was enacted by the territorial Assembly:

"That a married woman may convey any of her real estate, or any interest therein, by conveyance thereof, executed and acknowledged and certified in the same manner as provided in this act for other persons."

At the same time it was provided that:

"When a married woman is a party, her husband shall be joined with her; except that (1st) when the action concerns her separate property she may sue alone; (2nd) when the action is between herself and her husband she may sue and be sued alone," and "if the husband and wife be sued together the wife may defend in her own right."

At the time of her death, and prior thereto, by the territorial law of descent, it was provided that if the decedent leave a husband or wife "and more than one child, or one child and the issue of one or more deceased children living, the estate goes one-fourth to the surviving husband or wife, for life, and the remainder with the other three-fourths, to the surviving children and the issue of any deceased children by right of representation." In view of these, and of other similar acts of the territorial Assembly, it is difficult to maintain that during the marriage, and at the death of plaintiff's intestate the English common law as to married women was in force in the territory, to the extent that she had no legal existence and was incapable of holding, owning, or disposing of property. For these reasons, and since the action invokes

equity and calls for chancery jurisdiction involving fiduciary relations, and property rights between, and separate property and estates of, husband and wife, and since equity, both in this country and in England, recognized the wife's legal existence and enforced her right to enjoy, control, and dispose of her separate estate, we think the complaint not bad on the alleged ground of want of capacity of plaintiff's intestate to own, hold, and acquire property during the marriage, and that at her death "her estate," under the territorial law of descent, went one-fourth to her surviving husband for life, and the remainder, with the other three-fourths, to her surviving children. In no other respect is the complaint challenged for want of facts.

Now as to laches: Numerous cases from the federal courts are cited to the effect that equity often treats lapse of time, less than that prescribed by the statute of limitations, as a presumptive bar on the ground of discouraging stale claims, or gross laches, or unexplained acquiescence in the assertion of an adverse right. But federal courts as chancery courts are not controlled by statutes of limitations. *Miles* v. *Vivian,* 79 Fed. 848, 25 C. C. A. 208. Generally, in the state courts, the statute of limitations applies to equitable as well as legal actions, and, in the absence of an estoppel or prejudice, mere lapse of time short of the statute of limitations does not bar relief. *Hamilton* v. *Dooly,* 15 Utah 280, 49 Pac. 769; *Lux* v. *Haggin,* 69 Cal. 255, 4 Pac. 919, 10 Pac. 674; *Thomas* v. *Holmes,* 142 Iowa 288, 120 N. W. 636; 5 Pomeroy Eq. Jur., Section 21; *Lindell* v. *Lindell,* 142 Mo. 61, 43 S. W. 368; *Hawley* v. *Von Lanken,* 75 Neb. 597, 106 N. W. 456; *Farr* v. *Hanenstein,* 69 N. J. Eq. 740, 61 Atl. 147. On the face of the complaint it does not appear that the delay works a disadvantage, becomes inequitable, or operates as an estoppel against the assertion of the alleged rights.

Now as to the statute of limitations: The appellant asserts that the alleged rights are not barred because of the allegations respecting cotenancy, the relation of husband and wife, and of other trust and fiduciary relations, against which the statute does not run, until demand and

refusal, or ouster, or open repudiation, or open assertion
or an exercise of a dominion, so hostile and adverse as to
amount to an ouster or repudiation.   The authorities sus-
tain such view.   *Adams* v. *Hopkins,* 144 Cal. 19, 77 Pac.
712; *Parks* v. *Satterthwaite,* 132 Ind. 411, 32 N. E. 82; *Camp-
bell* v. *Whoriskey,* 170 Mass. 63, 48 N. E. 1070; *Ballou* v.
*Ballou,* 94 Va. 350, 26 S. E. 840, 64 Am. St. Rep. 733; *Rob-
inson* v. *Robinson,* 173 Mass. 233, 53 N. E. 854; *Rucker* v.
*Maddox,* 114 Ga. 899, 41 S. E. 68; *Boughton* v. *Flint,* 74 N. Y.
476; *Bartlett* v. *Wright,* 29 Ill. App. 339; *Miles* v. *Thorne,*
38 Cal. 335, 99 Am. Dec. 384; *Dresser* v. *Travis,* 39 Misc.
Rep. 358, 79 N. Y. Supp. 924.

Again, there is nothing appearing on the face of the com-
plaint to show any such demand and refusal, repudiation,
ouster, or hostile assertion or holding.   The respondents con-
tend that such ought to be conclusively presumed from the
mere lapse of time and sole possession.   We think not.   The
cases cited do not so broadly teach that.   They hold that long
delay and sole possession without an accounting is proper evi-
dence from which an adverse possession, ouster, hostile hold-
ing, or repudiation may be inferred.   Freeman, Cotenancy
and Partnership, Art. 242; *Frederick* v. *Grey,* 10 Serg. & R.
(Pa.) 188; *Lefavour* v. *Homan,* 3 Allen (Mass.) 355.   Such,
however, is not conclusively presumed as matter of law, but,
depending upon the circumstances of the parties and the par-
ticular facts of the case, may be inferred and found as matter
of fact.

Further, the general   rule,   as   stated   in   18   Cyc.
915, is:

"Where a cause of action accruing to testator or intestate is barred
by the general statute of limitations in his lifetime, his personal rep-
resentative cannot recover thereon, although decedent died on the
last day of the statutory period and the representative sued shortly
after his death.   As respects causes of action arising in decedent's
lifetime, but not barred by the general statute of limitations at the
time of his death, it is well settled that his death does not interrup
the running of the statute, in the absence of some statutory provision
to the contrary, and it has been held that the fact that the adminis-
trator is ignorant of the cause of action does not affect the rule.   A
cause of action which accrues to an administrator after the death

---

---

of an intestate is not complete, and does not arise and exist, so that the statute of limitations can begin to run upon it, until an administrator is appointed who can bring suit."

Such latter rule prevails in twenty or more different jurisdictions, including that of the Supreme Court of the United States, and is the rule in England. We believe it to be the weight of authority, though there are a few cases to the contrary. There are matters alleged in the complaint which relate to "causes of action arising after the decedent's death," and clearly as to those the action is not barred.

The only other point here urged is that the causes stated in the complaint do not conform to the claims as presented to and rejected by the defendants. Perhaps all that need be said as to this is that the actions are not of such character as to require presentation of claims within the meaning of our probate provisions. *Elizalde* v. *Elizalde,* 137 Cal. 634, 66 Pac. 369, 70 Pac. 861; *Roach* v. *Caraffa,* 85 Cal. 436, 25 Pac. 22; *Gillett* v. *Hickling,* 16 Ill. App. 392; *Probate Court* v. *Williams,* 30 R. I. 144, 73 Atl. 382, 19 Ann. Cas. 554; *Gunter* v. *Janes,* 9 Cal. 643. We are of the opinion that the ruling sustaining the demurrers was wrong.

The judgment of the court below is therefore reversed, and the cause remanded, with directions that the case be reinstated and the defendants given leave to answer. Costs to appellant.

McCARTY, J., concurs.

FRICK, J.

I concur in the result. I do not concur, however, in all that is said, or may be implied from what is said, upon the question of whether the common law of England or the so-called civil law was in force in the Territory of Utah from and after the adoption of the Organic Act in 1850 by Congress. I am of the opinion, and have always entertained the opinion, that since that act went into effect the common law of England, with certain exceptions and modifications, was in force in the Territory of Utah until modified by the laws enacted in the Territory and State of Utah. When that act was adopted, the territory, with the exception of a small number of settlers

from the eastern states, was a wilderness unknown to civilized man. That act was adopted as a basis of government for the few people who came from the states where the common law in a modified form, and not the civil law, was in force. Laws, whether written or unwritten, are intended to govern and control the rights and actions of civilized men; and they, under a system of government liks ours, may adopt their own laws and be governed by them. They could thus conform their actions to the principles of the common law in their domestic and other affairs without passing statutes, and it does not follow that they could not conform to a known system of laws before they enacted statutes; and this, in my judgment, is just what was done in the Territory of Utah. Besides, the first settlers of Utah must have been in sympathy with the principles of the common and not with those of the civil law, and hence had every reason to adopt and to be controlled by the principles of the former and not by those of the latter. Moreover, I think that it was the purpose of Congress, as well as that of the settlers, that the common law should prevail in the Territory of Utah.

It is, however, not to be assumed that for that reason the common law of England was intended to be adopted and enforced in every detail and as affecting every relation of life. Nor do I think the early settlers so intended or regarded the matter. That is sufficiently illustrated by the early territorial acts referred to by Mr. Chief Justice Straup relating to the things pointed out in his opinion. But those acts are not the only evidence that the common law was adopted and followed in the Territory of Utah. The hundreds and hundreds of court decisions of both the Supreme and the lower courts furnish ample proof that what I have hereinbefore stated is correct. When, therefore, in 1897 the commissioners appointed to revise the laws of Utah incorporated into the Revised Statutes of 1898, Section 2488, in which the ''common law of England, so far as it is not repugnant to or in conflict with * * * the Constitution and laws of this state,'' was adopted as the ''rule of decision in all the courts of this state,'' they merely readopted and declared what had already been declared by the courts many times in their decisions. It

may be assumed, therefore, that in matters relating to the property and kindred rights of the wife, as well as in many other respects, the common law of England was modified at an early date in the Territory of Utah, and that the people and the courts so regarded it.

As to the statute of limitations I entertain serious doubts. I feel constrained, however, to resolve those doubts against the demurrer, and thus permit the trial court to hear the evidence and make findings with regard to the conduct of the husband and wife regarding the porperty involved and the manner in which the business affairs were conducted and carried on by the husband, so that the proper inferences may be deduced as to whether the property was held by the husband in his own right and so regarded by the wife, or whether he held it in some other capacity. What the actual facts are in that regard can be determined far better after a hearing than upon a demurrer to the allegations of a pleading.

For those reasons, I concur in the reversal of the judgment, withholding, however, any opinion upon the question of whether there is ultimately to be a recovery upon the merits.