2007 UT 77
Aimee L. Ellis, Plaintiff, Appellant, and Cross-Appellee,
v.
The Estate of Steven Wade Ellis, Defendant, Appellee, and Cross-Appellant.
No. 20060359.
Supreme Court of Utah.
FILED September 21, 2007.
This opinion is subject to revision before final publication in the Pacific Reporter.
Kelly H. Macfarlane, Karra J. Porter, Salt Lake City, for plaintiff.
Stephen G. Morgan, Paul C. Farr, Salt Lake City, for defendant.
DURRANT, Justice:

INTRODUCTION
¶1 Aimee Ellis sued her husband Steven Ellis's estate (the "Estate") for personal injuries she suffered in a car accident as a result of his negligence. We are presented with two issues on appeal: first, whether the district court erred in ruling that Mrs. Ellis's negligence claim against her husband's estate is barred by the common-law doctrine of interspousal immunity and, second, whether the district court erred in ruling that lay affidavits established a genuine issue of material fact as to whether Mrs. Ellis was mentally incompetent such that the statute of limitations under Utah Code section 78-12-36 was tolled. We reverse the district court's decision as to the first issue, but affirm its decision as to the second.

BACKGROUND
¶2 On January 2, 2001, newlyweds Steven and Aimee Ellis were driving in an automobile that was owned by Mrs. Ellis's parents. Mr. Ellis was driving the car on a honeymoon snowmobiling trip with the permission of its owners. While traveling near Shelley, Idaho, Mr. Ellis lost control of the vehicle, crossed the center median into oncoming traffic, and collided with a two-ton Mitsubishi truck. Mr. Ellis died in the accident. For the purpose of this appeal, the Estate does not contest that the accident was caused by his negligence.
¶3 Mrs. Ellis was hospitalized for weeks with serious injuries suffered in the accident, including a severe head injury, numerous broken bones, internal injuries, and emotional trauma. She filed a personal injury action against her husband's estate on January 27, 2005. Because her claim was brought more than a year after Mr. Ellis's death, the Estate's liability was limited to the extent of the decedent's insurance coverage.[1]
¶4 The Estate filed a motion to dismiss on two separate grounds. The Estate first argued that Mrs. Ellis's claim was barred by the doctrine of interspousal immunity. The district court granted the Estate's motion on this ground, holding that interspousal immunity is abrogated in Utah only with respect to intentional torts. Mrs. Ellis now appeals this decision.
¶5 The district court denied the Estate's motion with respect to the Estate's second argument that the statute of limitations had run on Mrs. Ellis's negligence claim. Mrs. Ellis argued that she was "mentally incompetent" for a time sufficient to toll the four-year statute of limitations period pursuant to Utah Code section 78-12-36.[2] In support of her position, Mrs. Ellis filed her own affidavit and those of three family members, which set forth observations that she was mentally incompetent for a period of at least twenty-five days after the accident. The district court determined that these lay affidavits were sufficient to establish a genuine issue of material fact and send the matter to a jury. The Estate now cross-appeals this decision. We have jurisdiction pursuant to Utah Code section 78-2-2(3)(j).

STANDARD OF REVIEW
¶6 The district court granted a motion to dismiss, which presents a question of law that we review for correctness.[3] Moreover, the district court's interpretation of prior precedent, statutes, and the common law are questions of law that we review for correctness.[4]

ANALYSIS
¶7 We are presented with two issues on appeal: first, whether the common-law doctrine of interspousal immunity applies to negligence claims and, second, whether lay affidavits sufficiently establish a genuine issue of material fact as to mental incompetency such that the statute of limitations under Utah Code section 78-12-36[5] was tolled.
¶8 We hold that interspousal immunity has been abrogated in Utah with respect to all claims. In Stoker v. Stoker,[6] we explicitly held that the Legislature had abrogated interspousal immunity by enacting the Married Women's Act. Furthermore, we hold that Mrs. Ellis established a genuine issue of material fact as to whether she was mentally incompetent such that the statute of limitations under Utah Code section 78-12-36 was tolled. We now discuss both issues in turn.

I. INTERSPOUSAL IMMUNITY
¶9 Our cases regarding the common-law doctrine of interspousal immunity have traveled a tortuous path. As one sister court noted, "Between 1954 and 1980, the Utah Supreme Court twice reversed its interpretation of the governing statutes on the subject, each time by a divided court; and since 1980 the court has three times avoided deciding how its previous cases should be read."[7] While our pre-1980 precedent was contradictory and confusing, in that year we clearly held in Stoker that interspousal immunity has been abrogated in Utah by the Married Women's Act.
¶10 We will first discuss our prior cases that interpret the Married Women's Act and its application to interspousal immunity. We will then briefly discuss (and dismiss) the justifications for maintaining interspousal immunity.

A. Our Pre-Stoker Interspousal Immunity Precedent Presented Various Interpretations of the Married Women's Act
¶11 Interspousal immunity derives from the common-law concept of coverture. In Blackstone's Commentaries on the Laws of England, he describes a wife's legal disabilities due to coverture:
"By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband; under whose wing, protection, and cover, she performs every thing; . . . and her condition during her marriage is called her coverture. Upon this principle, of an union of person in husband and wife, depend almost all the legal rights, duties, and disabilities, that either of them acquire by the marriage."[8]
Thus, coverture arose because of the unity of husband and wife; upon marriage, the husband and wife became one, and therefore, the wife could neither sue that entity of which she was a part nor enforce liabilities against third parties.
¶12 In the revised statutes of 1898, the Utah Legislature enacted the Married Women's Act (the "Act"),[9] which enables wives to sue and be sued, enforce liabilities, and take actions to protect their rights "as if unmarried."[10] The pertinent parts of the Act, left unchanged from their original enactment, are found in Utah Code sections 30-2-2 and 30-2-4. Section 30-2-2 reads:
Contracts may be made by a wife, and liabilities incurred and enforced by or against her, to the same extent and in the same manner as if she were unmarried.
Section 30-2-4 reads:
A wife may receive the wages for her personal labor, maintain an action therefor in her own name and hold the same in her own right, and may prosecute and defend all actions for the preservation and protection of her rights and property as if unmarried. There shall be no right of recovery by the husband on account of personal injury or wrong to his wife, or for expenses connected therewith, but the wife may recover against a third person for such injury or wrong as if unmarried, and such recovery shall include expenses of medical treatment and other expenses paid or assumed by the husband.[11]
¶13 In Taylor v. Patten,[12] we first considered whether interspousal immunity was consistent with the Married Women's Act. In a 3-2 decision, we allowed a wife's intentional tort claim against her husband. We held that "[u]nder modern Husband and Wife statutes, such as ours, [the] fiction [of coverture] has been completely eliminated and the wife has been completely emancipated from this inability to own, control and manage her property, and from her inability to sue and be sued for the protection of her property and personal rights."[13] In the lead opinion, two members of the majority concluded as follows:
From the foregoing it is clear that the legislature intended to establish the separate identity of the husband and wife in all property and personal rights the same as if they were not married. Giving these statutes a liberal construction to effect their objects and in the interest of justice requires us to hold that a wife can sue and be sued the same as if she were unmarried, even for the recovery of damages from her husband for intentional personal injury.[14]
¶14 Justice Crockett limited his concurrence to the facts of the casethat the intentional tort occurred while the parties' divorce action was pendingand "reserv[ed] judgment as to the more comprehensive proposition that such a suit could be maintained at any time during the marriage relation."[15] Justice Crockett discussed the two primary justifications for interspousal immunity: the dangers of marital discord and collusive lawsuits. He noted "that [these] factors upon which the policy [of interspousal immunity] is based are either non-existent, or at least not nearly so cogent during the interlocutory period [of a pending divorce]."[16]
¶15 In Rubalcava v. Gisseman,[17] a 4-1 decision, we overruled Taylor and held that a wife could not sue her husband for a negligent tort arising during their marriage.[18] Writing for the majority, Justice Crockett used some of the same reasoning that he used in his concurrence in Taylor. In Rubalcava, we acknowledged the continued relevance of the underlying rationales for interspousal immunity.[19] We agreed with other courts "that it should be the purpose of the law to protect family solidarity."[20] We also stated that "the temptation to collusion exists; and this is increased when the supposedly adverse parties are in the symbiotic relationship of husband and wife."[21] Moreover, we stated that "to allow interspousal actions `encourages raids on insurance companies through unmeritorious claims which never would be instituted where the husband did not carry liability insurance, thus possibly raising insurance rates on thousands of honest persons for the benefit of the fraudulent few.'"[22] We also concluded that the Married Women's Act abolished interspousal immunity only in contract and property cases, stating that had the Legislature intended to abolish interspousal immunity in tort cases as well, it would have done so explicitly.[23]
¶16 In Taylor, the majority emphasized that the broad assertion in the first sentence of section 30-2-4 means that a wife has a general right to prosecute "all actions" for the preservation of her rights.[24] But in Rubalcava, the majority interpreted the first sentence as limited to actions concerning wages and property.[25] The majority also emphasized the reference in the second sentence of section 30-2-4 to the wife's right to recover against a "third person," concluding that the Legislature had only intended to allow a wife to pursue a tort claim against a third party and not against her husband.[26] We held that "[w]e are unable to find in this section, either expressly or by implication, any authority for the wife to sue her husband in tort."[27]

B. Stoker Abrogated Interspousal Immunity
¶17 In Stoker v. Stoker,[28] we reversed field once again, concluding that a wife may bring an intentional tort claim against her husband.[29] We turned to the same statutes we had analyzed twice before and reaffirmed the interpretation we had made in the Taylor lead opinion.[30] Justice Crockett, in his dissent in Stoker, reiterated the Rubalcava argument that the Legislature had abrogated interspousal immunity only in contract and property cases and had left interspousal tort immunity intact.[31] But the three members of the Stoker majority expressly rejected this analysis:
[Section 30-2-4] authorizes [a wife] to prosecute and defend all actions for the preservation and protection of her rights and property, as if unmarried. It speaks of rights and of property in the disjunctive, and, all actions for the preservation and protection of her rights would certainly include a right to be free from an intentional tort of her husband.[32]
¶18 In Stoker, we noted that the Married Women's Act was enacted with full knowledge of article I, section 11 of the Utah Constitution,[33] which reads as follows:
All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.
We also noted that the Married Women's Act was enacted with full knowledge of article IV, section I,[34] which reads as follows:
The rights of citizens of the State of Utah to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this State shall enjoy equally all civil, political, and religious rights and privileges.
¶19 Furthermore, we stated that the Married Women's Act is in derogation of the common law.[35] As a result, its provisions are to be liberally construed pursuant to Utah Code section 68-3-2, which provides:
The rule of the common law that statutes in derogation thereof are to be strictly construed has no application to the statutes of this state. The statutes establish the laws of this state respecting the subjects to which they relate, and their provisions and all proceedings under them are to be liberally construed with a view to effect the objects of the statutes and to promote justice. Whenever there is any variance between the rules of equity and rules of common law in reference to the same matter the rules of equity shall prevail.[36]
We continued, "To read into our Married Women's Act, a proscription against a wife suing her husband, would be to construe it so strictly as to add a provision which the legislature did not put there."[37]
¶20 Ultimately, in Stoker we held that
[t]he old common law fiction [of coverture] is not consonant with the realities of today. One of the strengths of the common law was its ability to change to meet changed conditions. Here, the Legislature did not wait for the common law to change, it made the change for it; and did so at a time when a great many of Utah's sister states were enacting, or had previously enacted, Married Women's Acts. Our holding today reaffirms the Legislative abrogation of Interspousal Immunity.[38]

C. Interspousal Immunity Has Been Abrogated with Respect to All Claims
¶21 We now reiterate our Stoker analysis and hold that the common-law doctrine of interspousal immunity has been abrogated with respect to all claims. We agree with the Arizona Court of Appeals, which deftly discussed our precedent in Lucero v. Valdez,[39] that "the rationale the Stoker court articulated in rejecting the doctrine of interspousal immunity applies equally to negligence cases as to cases of intentional torts."[40] In Stoker, we held that under the Married Women's Act "all actions for the preservation and protection of [a wife's] rights would certainly include a right to be free from an intentional tort of her husband."[41] Thus, as the Lucero court noted, one "cannot escape the paraphrase that `all actions for the preservation and protection of a married woman's rights' would equally include a right to be free from a husband's negligent tort."[42]
¶22 Further, neither Rubalcava nor Stoker "attributes any merit to the distinction . . . between negligence and intentional tort claims."[43] Indeed, even "the Rubalcava majority pointedly rejected such a distinction, stating: `[N]o basis can be found [in our statutes] for any distinction between intentional or unintentional torts. Under [our statutes] the plaintiff either has a right to bring an action in tort, or she does not.'"[44]
¶23 Finally, in Stoker, after reversing course from Rubalcava and reaffirming Taylor, we made this broad, clear statement: "Our holding today reaffirms the Legislative abrogation of Interspousal Immunity."[45] Stoker was meant to be our final pronouncement on the subjectinterspousal immunity was now dead in Utah as to all claims. Because we stopped short in subsequent cases of stating that Stoker's holding applies to negligence claims as well, however, the Estate now argues that Stoker is limited to its facts.[46] But in each of these cases, it was unnecessary to reach the issue. We reject the Estate's attempt to limit Stoker.
¶24 In sum, because we rejected in Rubalcava and Stoker any distinction, for the purposes of interspousal immunity, between negligent and intentional torts, and because in Stoker we rejected interspousal immunity for reasons that apply equally to negligent and intentional torts, we conclude that interspousal immunity has been abrogated in Utah with respect to all claims.[47]

D. The Justifications for Interspousal Immunity Are Meritless
¶25 Our determination to reaffirm Stoker's rejection of interspousal immunity as to tort claims is based on our conclusion that the two primary rationales used to justify interspousal immunitymarital discord and collusionare ultimately without merit. We briefly discuss these rationales below.

1. Marital Discord
¶26 We observed long ago that the "[u]nity of man and wife can never be created by law, but by nature; and where there is discord, no legal rules can create harmony."[48] Moreover, the New Jersey Supreme Court has stated as follows:
Courts can claim no penetrating insight by which to fathom the impact of an interspousal law suit or gauge its effect upon the strength or fragility of a marriage. The threat to domestic harmony posed by a legal action between spouses is an imponderable; the cohesiveness of a marriage may be jeopardized as much by barring a cause of action as allowing it.
Furthermore, "the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup."[49]
¶27 We agree that "the choice to sue, or not to sue, should be that of the parties to the marriage."[50] It is difficult to see how barring compensation for an injurywhich bar could itself lead to financial, physical, or emotional distresswill strengthen or protect a marriage. Indeed, it is "doubtful that peace and harmony of the home can be preserved or restored by refusing to redress a palpable wrong or to compensate a genuine injury."[51]

2. Collusion
¶28 We have previously rejected the notion that the potential for collusion is a sufficient rationale for prohibiting certain kinds of litigation.[52] In Farmers Insurance Exchange v. Call,[53] we held that a household exclusion clause in an automobile insurance policy is contrary to statutory requirements and public policy.[54] We stated that
we are not persuaded that the collusion rationale . . . remains an adequate justification for the household exclusion clause. In [Malan], this Court determined that the Utah Guest Statute is unconstitutional and found the collusion rationale to be insufficient to deny coverage to innocent guest passengers injured in automobile accidents. In addition, the risk of collusion in intrafamily litigation has never been accepted by this Court as grounds for endorsing the parent-child immunity doctrine, which has likewise never been established by the legislature.[55]
¶29 In Call, we adopted the following rationale from the Kansas Supreme Court:
"The possibility of collusion exists to a certain extent in any case. Everyday [sic] we depend on juries and trial judges to sift evidence in order to determine the facts and arrive at proper verdicts. Experience has shown that the courts are quite adequate for this task. In litigation between parent and child, judges and juries would naturally be mindful of the relationship and would be even more on the alert for improper conduct."[56]
This reasoning, which we have applied in allowing parent-child lawsuits,[57] applies equally to lawsuits between husband and wife.

II. STATUTE OF LIMITATIONS
¶30 Mrs. Ellis was required to file her negligence claim within four years pursuant to the general statute of limitations, section 78-12-25.[58] Mrs. Ellis's cause of action accrued on January 2, 2001, but she did not file her negligence claim until January 27, 2005, twenty-five days after four years had elapsed.
¶31 The Estate argues that Mrs. Ellis's claim should be barred. Ellis responds that the statute of limitations was tolled by section 78-12-36, which tolls the statute if a person is "mentally incompetent."[59] Section 78-12-36 reads:
If a person entitled to bring an action, other than for the recovery of real property, is at the time the cause of action accrued, either under the age of majority or mentally incompetent and without a legal guardian, the time of the disability is not part of the time limited for the commencement of the action.[60]
¶32 In support of her position, Mrs. Ellis filed four affidavitsone from her mother, two from her sisters, and one from herself. The affidavits state that Mrs. Ellis was mentally incompetent for a period of at least twenty-five days after the automobile accident. They describe Mrs. Ellis's serious condition and her inability to take care of herself after the accident. The district court determined that these lay affidavits were sufficient to establish a genuine issue of material fact and send the matter to a jury. We agree.

A. Lay Affidavits Are Sufficient To Create a Genuine Issue of Material Fact as to "Mental Incompetence" Under Section 78-12-36
¶33 In O'Neal v. Division of Family Services,[61] we discussed the application of section 78-12-36 as to mental incompetency:
The Utah legislature has recognized that the mechanical application of statutorily fixed limitations periods may unjustly penalize people who are unable to bring or maintain an action because of disability. To address this problem, the legislature has provided for the tolling of statutes of limitations during a plaintiff's disability.[62]
We continued, "Tolling statutes based on mental incompetency are enacted to relieve from the strict time restrictions people `who are unable to protect their legal rights because of an overall inability to function in society.'"[63] Ultimately, we held:
In determining what sort of lack of ability and capacity to protect one's legal rights qualifies for disability protection, courts generally hold that a person is incompetent for the purposes of a provision tolling a statute of limitations "when the disability is of such a nature to show him [or her] unable to manage his [or her] business affairs or estate, or to comprehend his [or her] legal rights or liabilities."[64]
¶34 The Estate argues that expert testimony, medical records, or a medical diagnosis identifying a specific condition or disability must be submitted to show mental incompetency under section 78-12-36. The Estate contends that the lay affidavits from Mrs. Ellis's family members are inadmissible because they are insufficient to show mental incompetency. We disagree.
¶35 The Estate relies on Columbo v. United States Postal Service,[65] which noted that
[t]he question of whether a person is sufficiently mentally disabled to justify tolling of a limitation period is . . . highly case-specific. The burden lies with the party seeking tolling to provide that it is appropriate. Because mental illnesses are as varied as physical illnesses . . . [a] conclusory and vague claim, without a particularized description . . . is manifestly insufficient to justify any further inquiry into tolling.[66]
The Estate argues that Mrs. Ellis has not provided a "particularized description" of her disability, which must inc`lude a specific medical diagnosis. But the statement in Columbo refers to "mental illnesses," while in this case we are dealing solely with the legal definition of mental incompetency that we discussed in O'Neal. And Mrs. Ellis's affidavits do describe with particularity her legal disability after the accident.
¶36 For example, in O'Neal we considered nonmedical evidence to determine that O'Neal was not mentally incompetent so as to toll the statute of limitations.[67] We noted that from 1977 until 1986, O'Neal was able to care for his personal safety and provide himself with necessities such as food, shelter, medical care, and clothing.[68] We noted that he received his general education degree and attended classes at Utah Technical College.[69] He also worked at a number of odd jobs while living with his mother or roommates.[70] Finally, we noted that, since 1981, O'Neal lived either alone or with a roommate and worked at Rocky Mountain Helicopters, where he was promoted from driving a truck to negotiating the recovery of warranty damages from suppliers for the failure of covered parts.[71] This nonmedical, nonexpert evidence went directly to O'Neal's mental competency under section 78-12-36his ability to "manage his business affairs or estate" or "to comprehend his legal rights or abilities." In addition, this evidence showed his ability to care for himself and provide necessities such as food, shelter, and clothing. Thus, O'Neal illustrates that we will consider lay evidence in regard to a person's alleged disability under the tolling statute; expert testimony, medical records, and a medical diagnosis, while potentially helpful, are not necessary under the statute or any of our previous cases. Indeed, we agree with Mrs. Ellis that "mental incompetency" under section 78-12-36 is a legal disability that is addressed by precisely the testimony she proferred with respect to her family's affidavits. As a result, we affirm the district court's decision, which held that there was a genuine issue of material fact as to Mrs. Ellis's mental incompetency so as to toll the statute of limitations under section 78-12-36.

B. A Party May File Suit at any Time During the Limitations Period or After the Limitations Period if It Was Properly Tolled
¶37 The Estate argues that, even if Mrs. Ellis could establish mental incompetency for a period of twenty-five days, her action would be barred because she still had over three and one-half years to bring her claim and failed to do so. Accordingly, the Estate relies on Atwood v. Sturm,[72] arguing that it stands for the proposition that because Ellis failed to file after she had (1) notice of her claim and (2) a reasonable three-and-one-half-year opportunity to bring that claim, her lawsuit should be dismissed. We disagree.
¶38 In Atwood, we held that section 78-12-36 did not toll the applicable statute of limitations where the plaintiff was initially in the hospital for two weeks.[73] We stated as follows:
Clearly, plaintiff does not come within [section 78-12-36]. While plaintiff was prevented from obtaining legal advice or pursuing any action during his hospitalization, nevertheless, he had the balance of the four-year period to bring this action. He learned in the spring of 1988 that he had a potential lawsuit and had a number of months thereafter to file his action; the initial two-week hospitalization at the beginning of the four-year period was inconsequential in affecting his legal rights.[74]
In Atwood, we held that the plaintiff was not mentally incompetent under section 78-12-36.[75] Thus, the tolling statute did not even apply, and the initial two-week stay in the hospital became inconsequential in our analysis. Moreover, the language we used in Atwood does not stand for the proposition that once a person has notice of a claim and a realistic opportunity to pursue that claim, she cannot delay in bringing her claim. Such reasoning contradicts the plain language of our statutes of limitations. In Mrs. Ellis's case, she had the balance of the four years to bring her negligence claim, regardless of whether she had notice of her claim and an opportunity to pursue it more than three and one-half years earlier.

CONCLUSION
¶39 The common-law doctrine of interspousal immunity has been abrogated in Utah with respect to all claims; therefore, we reverse the district court's grant of summary judgment. But we affirm the district court's decision that the lay affidavits presented sufficient evidence to establish a genuine issue of material fact as to Mrs. Ellis's mental incompetency so as to toll the statute of limitations under Utah Code section 78-12-36. Accordingly, we remand to the district court for further proceedings.
¶40 Chief Justice Durham, Associate Chief Justice Wilkins, Justice Parrish, and Justice Nehring concur in Justice Durrant's opinion.
NOTES
[1] See Utah Code Ann. § 75-3-803(1)(a), (4)(b) (1993).
[2] Utah Code Ann. § 78-12-36 (2002).
[3] See St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194, 196 (Utah 1991) (stating that "the propriety of a 12(b)(6) dismissal is a question of law," which appellate courts review "under a correctness standard").
[4] See State v. Leyva, 951 P.2d 738, 741 (Utah 1997) ("A lower court's interpretation of binding case law presents a question of law which we review for correctness.").
[5] Utah Code Ann. § 78-12-36 (2002).
[6] 616 P.2d 590 (Utah 1980).
[7] Lucero v. Valdez, 884 P.2d 199, 205 (Ariz. Ct. App. 1994).
[8] Stoker v. Stoker, 616 P.2d 590, 590-91 (Utah 1980) (quoting Cooley's Blackstone, Volume 1, Book 1, Chapter 15, page 290 (1879)).
[9] See Utah Rev. Stat. § 1201 (1898).
[10] Utah Code Ann. § 30-2-4 (1998).
[11] (Emphasis added.)
[12] 275 P.2d 696 (Utah 1954).
[13] Id. at 697-98.
[14] Id.
[15] Id. at 699.
[16] Id. at 700.
[17] 384 P.2d 389 (Utah 1963).
[18] Id. at 393.
[19] Id. at 391-92.
[20] Id. at 391.
[21] Id.
[22] Id. at 391-92 (quoting Brown v. Gosser, 262 S.W.2d 480, 485 (1953) (Sims, C.J., dissenting)).
[23] Id. at 393.
[24] Taylor v. Patten, 275 P.2d 696, 697 (Utah 1954).
[25] 384 P.2d at 393. We stated as follows:

It is argued that this delineation of rights, particularly [section 30-2-2], which authorizes a wife to enforce her contracts; and [section 30-2-4], which states that she may "prosecute and defend all actions for the preservation and protection of her rights and property as if unmarried," provide the foundation for this action. However, careful reading shows that with respect to authorization in those two sections, the former speaks only of contracts and the latter is referring only to her wages and property rights.
Id.
[26] Id. ("Since the husband and wife are the only two persons mentioned, the authorization of the wife to recover `against a third person' can only reasonably be interpreted as against someone other than the husband.").
[27] Id.
[28] 616 P.2d 590 (Utah 1980).
[29] Id. at 592.
[30] Id.
[31] Id. at 593 (Crockett, C.J., dissenting).
[32] Id. at 591 (emphasis added).
[33] Id.
[34] Id.
[35] Id.
[36] Utah Code Ann. § 68-3-2 (2004).
[37] Stoker, 616 P.2d at 591.
[38] Id. (emphasis added).
[39] 884 P.2d 199 (Ariz. Ct. App. 1994).
[40] Id. at 205.
[41] Stoker, 616 P.2d at 591 (emphasis added).
[42] Lucero, 884 P.2d at 205.
[43] Id.
[44] Id. (emphasis in Lucero) (quoting Rubalcava v. Gisseman, 384 P.2d 389, 392 (Utah 1963)).
[45] Stoker, 616 P.2d at 592.
[46] See Forsman v. Forsman, 779 P.2d 218, 220 (Utah 1989) (applying California law rather than determining the applicability of the wife's negligence claim against her husband under Utah law); Noble v. Noble, 761 P.2d 1369, 1375 (Utah 1988) ("In Stoker, this Court held that [interspousal immunity] had been abrogated with respect to intentional torts. We have never had occasion to decide whether this abrogation extended to negligence claims, and we do not do so in this case. It is unnecessary for us to reach that question because our disposition of [the wife's] intentional tort action makes it a certainty that she will have a remedy for her injuries." (internal citation omitted)); State Farm Mut. Auto. Ins. Co. v. Mastbaum, 748 P.2d 1042, 1044-45 (Utah 1987) (Zimmerman, J., concurring) ("Inasmuch as there are no grounds for reversing the instant case, I think it unnecessary for us to decide at this juncture whether [Stoker] abrogated interspousal immunity with respect to actions grounded in negligence as well as those grounded in intentional torts.").
[47] See Lucero, 884 P.2d at 205.
[48] Hatch v. Hatch, 148 P. 1096, 1100 (Utah 1915).
[49] Merenoff v. Merenoff, 388 A.2d 951, 959 (N.J. 1978) (quoting Eisenstadt v. Baird, 405 U.S. 438, 453 (1972)).
[50] Id.
[51] W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 122, at 903 (5th ed. 1984).
[52] See Farmers Ins. Exch. v. Call, 712 P.2d 231, 235 (Utah 1985); Malan v. Lewis, 693 P.2d 661, 674 (Utah 1984).
[53] 712 P.2d 231 (Utah 1985).
[54] Id. at 236.
[55] Id. at 235.
[56] Id. (quoting Nocktonick v. Nocktonick, 611 P.2d 135, 142 (Kan. 1980)). Along these same lines, the California Supreme Court stated as follows:

It would be a sad commentary on the law if we were to admit that the judicial processes are so ineffective that we must deny relief to a person otherwise entitled simply because in some future case a litigant may be guilty of fraud or collusion. Once that concept were accepted, then all causes of action should be abolished. Our legal system is not that ineffectual.
Klein v. Klein, 376 P.2d 70, 73 (Cal. 1962). Further, the Nebraska Supreme Court stated as follows:
To adopt such a view requires the blanket assumption that our court system is so ill-fitted to deal with such litigation that the only reasonable alternative to allowing husband-wife tort litigation is to summarily deny all relief to this class of litigants. . . . We ought not deny what should be due the many for fear that the judicial process cannot weed out the spurious claims of a few.
Imig v. March, 279 N.W.2d 382, 385 (Neb. 1979).
[57] E.g., Bishop v. Nielsen, 632 P.2d 864, 865 (Utah 1981) (holding that parent-child immunity does not exist in Utah).
[58] Utah Code Ann. § 78-12-25 (2002).
[59] Id. § 78-12-36.
[60] The statute reads "mentally incompetent and without a guardian." Id. (emphasis added). Thus, the tolling statute will not operate if a person is mentally incompetent but has a legal guardian. In this case, Mrs. Ellis was of the age of majority and no guardian had been appointed for her.
[61] 821 P.2d 1139 (Utah 1991).
[62] Id. at 1141.
[63] Id. at 1142 (quoting McCarthy v. Volkswagen of Am., Inc., 435 N.E.2d 1072, 1075 (N.Y. 1982)).
[64] Id. (alterations in O'Neal) (quoting 51 Am. Jur. 2d Limitation of Actions § 182 (1970)). In O'Neal, we also discussed a definition of mental incompetence from the probate code, which makes it somewhat easier to determine that a person is competent. Id.; see In re Boyer, 636 P.2d 1085, 1089 (Utah 1981). We noted that this "competency determination focused on a person's ability to care for his or her personal safety and provide basic human needs such as food, shelter, and clothing." O'Neal, 821 P.2d at 1142.
[65] 293 F. Supp. 2d 219 (E.D.N.Y. 2003).
[66] Id. at 223-24 (internal quotation marks and citations omitted).
[67] O'Neal, 821 P.2d at 1142.
[68] Id.
[69] Id.
[70] Id.
[71] Id.
[72] 823 P.2d 1064 (Utah 1992).
[73] Id. at 1065.
[74] Id.
[75] Id.