IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20100541-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (August 30, 2012) |
| Edward Joseph Strieff Jr., | ) | |
| | ) | 2012 UT App 245 |
| Defendant and Appellant. | ) | |

-----

Third District, Salt Lake Department, 071900011
The Honorable Michele M. Christiansen

Attorneys:     Elizabeth A. Lorenzo and Robert K. Engar, Salt Lake City, for Appellant
               Mark L. Shurtleff and Jeffrey S. Gray, Salt Lake City, for Appellee

-----

Before Judges Voros, Thorne, and Roth.

ROTH, Judge:

¶1     Edward Joseph Strieff Jr. appeals from his convictions for attempted possession of a controlled substance and possession of drug paraphernalia. Strieff contends that the district court erroneously denied his motion to suppress the evidence underlying these convictions by applying an intervening circumstances exception not recognized by Utah law or the Utah Constitution. Because we conclude that the district court applied the proper test and correctly denied the motion to suppress, we affirm.

## BACKGROUND

¶2 After receiving an anonymous tip that drug activity was occurring at a home in South Salt Lake, Utah, Officer Doug Fackrell conducted intermittent surveillance of the home for approximately three hours over a one-week period. In the course of his surveillance, Officer Fackrell observed short-term traffic at the house, which in his experience was consistent with drug sales activity. Consequently, Officer Fackrell decided he needed to "find out what was going on [in] the house."

¶3 Officer Fackrell then saw Strieff leave the home on foot. Although he had not witnessed Strieff's arrival at the house, Officer Fackrell believed, based on his observations of other short-term traffic at the location, that Strieff was a short-term visitor who might be involved in drug activity, so he followed Strieff in his unmarked vehicle. When Strieff approached a 7-Eleven, Officer Fackrell pulled alongside him, stepped out of his vehicle, and identified himself as a police officer. The officer then asked Strieff what he had been doing at the house. Officer Fackrell also requested identification, and Strieff produced an identification card, which the officer retained while he ran a warrants check. That inquiry revealed a "small traffic warrant." As a result, Officer Fackrell arrested Strieff and, in the course of conducting a search incident to the arrest, discovered "a white crystal substance" that "tested positive for methamphetamine," "a small green plastic scale" covered with a "white powder residue," and a glass pipe. Strieff was subsequently charged with unlawful possession of a controlled substance and possession of drug paraphernalia.

¶4 Strieff moved to suppress the methamphetamine and paraphernalia evidence, asserting that it had been obtained as the result of an illegal seizure. The State conceded that Officer Fackrell had illegally detained Strieff[1] but argued that the evidence was

---

1. The parties agree that Officer Fackrell's detention of Strieff was a level two encounter that required reasonable, articulable suspicion that Strieff was engaged in criminal wrongdoing. *See generally State v. Hansen*, 2002 UT 125, ¶ 35, 63 P.3d 650 (recognizing three levels of encounters between police and the public and stating that a level two detention requires the officer to have "'specific and articulable facts and rational inferences [that] . . . give rise to a reasonable suspicion a person has [committed] or is

(continued...)

nevertheless admissible because it "was discovered during a search incident to a lawful warrant-arrest. . . . [and therefore] was not a product of the initial detention." *See generally Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (stating that "the more apt question" in determining whether evidence obtained from "the illegal actions of the police" should be suppressed is "whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint"); *State v. Arroyo*, 796 P.2d 684, 690 n.4 (Utah 1980) (employing a three-part test for determining whether evidence is obtained through exploitation of an illegal search or seizure, which requires consideration of the temporal proximity between the discovery of the evidence and the initial illegality, the presence or absence of intervening circumstances, and the purpose and flagrancy of the officer's misconduct).

¶5     The district court agreed with the State, concluding that although the illegal seizure and the search occurred in quick succession and their temporal proximity therefore weighed in favor of suppression, an intervening circumstance—the discovery of the warrant—and the officer's lack of purposefulness and flagrancy in detaining Strieff weighed against exclusion of the evidence. The district court concluded that, on balance, the attenuation factors supported a determination that the discovery of the evidence was not a result of exploitation of the initial illegality and denied Strieff's motion to suppress. Strieff entered conditional guilty pleas[2] to attempted possession of a controlled substance and possession of drug paraphernalia. He now appeals,

---

1. (...continued)
committing a crime'" (quoting *United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir. 1990))). The State has conceded that Officer Fackrell lacked the required degree of suspicion, and, for purposes of this decision, we assume that the initial detention was unlawful.

2. A conditional guilty plea reserves the defendant's right to appeal a denial of a motion to suppress and "allows withdrawal of the plea if [the] defendant's arguments in favor of suppression are accepted by the appellate court." *State v. Sery*, 758 P.2d 935, 938 (Utah Ct. App. 1988).

asserting that the district court applied a test not recognized by Utah law to deny his motion to suppress.

ISSUE AND STANDARD OF REVIEW

¶6    Strieff recognizes that both the United States Supreme Court and the Utah Supreme Court have applied the attenuation doctrine for the purpose of assessing whether evidence obtained during a search or seizure conducted in violation of the Fourth Amendment must be suppressed or whether it is sufficiently separate from the initial illegality to be purged of any taint. *See Wong Sun*, 371 U.S. at 487–88; *Arroyo*, 796 P.2d at 690 n.4. Strieff contends, however, that in considering the warrant as an intervening circumstance, the district court went beyond the bounds of the attenuation doctrine as it has been recognized under Utah law.[3] We review the district court's denial of a motion to suppress for correctness. *See State v. Tripp*, 2010 UT 9, ¶ 23, 227 P.3d 1251. We likewise review the court's interpretation of precedent in reaching its decision to suppress for correctness. *See generally Ellis v. Estate of Ellis*, 2007 UT 77, ¶ 6,

---

3. Strieff purports to raise a challenge under both the Fourth Amendment to the federal constitution and its state constitution counterpart, article 1, section 14. While Strieff effectively develops the general notion that Utah courts have recognized that article 1, section 14 can provide greater protection than the Fourth Amendment, his criticism of the district court's attenuation analysis relies on Utah cases addressing application of the attenuation doctrine only in the context of the federal constitution. *See, e.g., State v. Thurman*, 846 P.2d 1256 (Utah 1993); *State v. Arroyo*, 796 P.2d 684 (Utah 1990); *State v. Newland*, 2010 UT App 380, 253 P.3d 71. And neither those cases, nor any other Utah cases discussing the attenuation doctrine, suggest that its application would differ under the state constitution. Furthermore, Strieff does not explain how the state constitution might provide broader or different protections in this context than does the federal constitution. Strieff's claim is therefore more accurately viewed as a contention that the district court failed to properly apply the attenuation doctrine as it has been adopted by the Utah courts. Consequently, we must decline Strieff's invitation to separately analyze the attenuation doctrine under article I, section 14 of the Utah Constitution. *See generally State v. Van Dyke*, 2009 UT App 369, ¶ 17 n.4, 223 P.3d 465 (declining to engage in an independent analysis under the state constitution when the defendant did not supply any legal analysis or authority).

169 P.3d 441 (stating the standard for reviewing the district court's interpretation of precedent).

ANALYSIS

I. *State v. Topanotes*

¶7     As a threshold matter, we address Strieff's contention that the methamphetamine and paraphernalia evidence discovered by Officer Fackrell following the warrant arrest must be suppressed under the reasoning of the Utah appellate courts in *State v. Topanotes*, 2003 UT 30, 76 P.3d 1159, and a number of other cases.  Unlike the dissent, we are not persuaded that *Topanotes* is controlling authority in this case.  But, because of the similarity of the facts between the two cases and the dissent's thoughtful discussion of *Topanotes*, we engage in a separate analysis to explain how we distinguish it from the case before us.

¶8     The Fourth Amendment protects against unreasonable searches and seizures. *See* U.S. Const. amend. IV.  The exclusionary rule is a judicial remedy that renders "evidence obtained by searches and seizures in violation of the Constitution . . . inadmissible in state court." *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).  The exclusionary rule is not absolute, however; evidence seized as a result of an illegal search or seizure may be admissible under three "closely related but analytically distinct" exceptions: independent source, inevitable discovery, and attenuation. *See United States v. Terzado-Madruga*, 897 F.2d 1099, 1113 (11th Cir. 1990).  Under the independent source doctrine, challenged evidence is admissible despite the constitutional violation "if it derived from a lawful source independent of the illegal conduct." *Id.*  The inevitable discovery doctrine is an extension of the independent source doctrine and deems admissible evidence discovered during an illegal search or seizure "if it inevitably or ultimately would have been discovered by lawful means without reference to the police misconduct." *Id.*  And the attenuation doctrine considers whether the "causal connection between the constitutional violation and the discovery of the evidence has become so attenuated as to dissipate the taint" of the initial illegality, making suppression unnecessary as a deterrent. *Id.*

¶9	Although *Topanotes* is nearly factually identical to the present case,[4] the Utah Supreme Court was analyzing whether drug evidence discovered pursuant to arrest on a warrant discovered following an illegal detention could be admitted under the inevitable discovery doctrine, not the attenuation doctrine. The dissent places emphasis on the "closely related" aspect of the relationship between the three exceptions, noting that it was unlikely that the "Utah Supreme Court would have allowed the evidence discovered in [*Topanotes*] if only the State had urged the attenuation doctrine instead of the 'closely related' inevitable discovery doctrine." *See infra* ¶ 56 (quoting *Terzado-Madruga*, 897 F.2d at 1113). However closely related these doctrines are, they are nevertheless "analytically distinct," and we believe that our treatment of the warrant discovery in this case as an issue of first impression under the attenuation doctrine is therefore justified. *Compare Topanotes*, 2003 UT 30, ¶ 16 (noting that "[a] crucial element of inevitable discovery is independence; there must be some 'independent basis for discovery'" (citation omitted)), *with State v. Newland*, 2010 UT App 380, ¶¶ 9, 11, 253 P.3d 71 (requiring a causal connection between the initial illegality and the challenged evidence for application of the attenuation doctrine and focusing on whether the evidence is obtained "'by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint'" (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963))).

¶10	Indeed,

> [t]he inevitable discovery doctrine allows the admission of evidence that was seized illegally if it would have been seized legally eventually. . . . In contrast, the attenuation doctrine admits evidence that is obtained with the authority of law provided that the evidence was not come at by the exploitation of a prior illegal act.

*State v. Eserjose*, 259 P.3d 172, 183 (Wash. 2011) (en banc) (emphasis and internal quotation marks omitted). Using the inevitable discovery doctrine, courts therefore consider whether, given the facts and circumstances surrounding the discovery of evidence, the police would have discovered the evidence anyway in the absence of the

---

4. For a fuller discussion of the factual similarities between the two cases, see the dissenting opinion at paragraph 43.

initial illegality. *See Topanotes*, 2003 UT 30, ¶ 14. In such a case, the exclusionary rule is deemed inapplicable because "[t]he causal chain between the illegality and the discovered evidence [would have been] broken [by] the evidence [being] . . . discovered through independent and lawful activity—in other words through an independent source." *State v. Worwood*, 2007 UT 47, ¶ 43, 164 P.3d 397 (internal quotation marks omitted); *see also Nix v. Williams*, 467 U.S. 431, 459 (1984) (Brennan, J., dissenting) (noting that the inevitable discovery exception is a corollary of the independent source doctrine that requires a "hypothetical finding" that the evidence would have been discovered *despite* the illegality). If the evidence would not *necessarily* have been discovered, then it must be excluded to effect the primary purpose of the exclusionary rule: to deter unconstitutional police conduct. *See Topanotes*, 2003 UT 30, ¶ 19 ("Allowing the evidence [where it might not have been discovered absent the illegality] would provide no deterrent at all to future unlawful detentions."). With the attenuation doctrine, however, the illegality is not disregarded but instead is the lens through which the discovery of the evidence must be examined in order to determine whether suppression is appropriate. *See generally State v. Arroyo*, 796 P.2d 684, 690 n.4 (Utah 1990) (identifying temporal proximity, intervening circumstances, and purpose and flagrancy of the officer's conduct as the factors a court must consider in determining whether the discovery of evidence is attenuated from the initial illegality). This is because the "attenuation analysis does not apply . . . absent an initial finding of at least *some* causal connection between the illegality and the testimony." *Terzado-Madruga*, 897 F.2d at 1116. Thus, "[e]ven if the illegality is the 'but for' reason for the evidence's discovery, it should still be admitted if it is sufficiently attenuated to dissipate the taint of the illegality." *Worwood*, 2007 UT 47, ¶ 44 (internal quotation marks omitted). Under this analysis, the degree to which the initial illegality was purposeful and flagrant and the degree to which the mechanism that led to discovery of the evidence (e.g., an apparently voluntary statement or consent to search or, as here, the discovery of an arrest warrant) was affected by the initial illegality are considered together in order to determine whether the evidence was so tainted that it ought to be suppressed. *See infra* ¶¶ 22, 30–33.

¶11    Which exclusionary rule exception is being applied not only affects how a court views the circumstances surrounding the illegality but might also result in the development of a factual record with a different focus on what is relevant, i.e., where certain facts are added or omitted or are given more or less attention and weight. For example, in an inevitable discovery case, the court focuses on what would have

happened if the police misconduct had not occurred.  The purpose and flagrancy with which the officer acted—the central component of an attenuation analysis—is therefore of little, if any, consequence because the facts are viewed in a light where the illegality is disregarded.  Indeed, the purpose and flagrancy of the officer's conduct in *Topanotes* is not even mentioned, much less assessed.  In an attenuation analysis, on the other hand, the circumstances surrounding the illegality and discovery of evidence are at the heart of the inquiry, and little emphasis is placed on what might have occurred if the officer had not illegally seized or searched the defendant.  Thus, although both exceptions strive to temper the harsh consequences of the exclusionary rule in circumstances where police misconduct is unlikely to be deterred by suppression, they employ "analytically distinct" methods for assessing whether apparently "tainted" evidence has been sufficiently cleansed.  *See, e.g., United States v. Fialk*, 5 F.3d 250, 251 (7th Cir. 1993) (declining to consider the attenuation doctrine when the government argued only inevitable discovery despite the attenuation doctrine being "better fitted" to the facts of the case); *Terzado-Madruga*, 897 F.2d at 1113, 1116 (admitting evidence pursuant to the inevitable discovery and independent source doctrines but not the attenuation doctrine).  Because the analytical approaches of the inevitable discovery and the attenuation doctrines are sufficiently distinct, we do not believe that *Topanotes*, which evaluates the admissibility of evidence discovered pursuant to a warrant arrest under the inevitable discovery doctrine, constrains our analysis under the separate attenuation doctrine.[5]

---

5. Strieff has directed us to a number of other cases in which evidence discovered during the search incident to an arrest on a valid warrant was suppressed.  *See State v. Johnson*, 805 P.2d 761, 764 (Utah 1991); *State v. Swanigan*, 699 P.2d 718, 719 (Utah 1985) (per curiam); *State v. Chism*, 2005 UT App 41, ¶ 22, 107 P.3d 706; *State v. Valdez*, 2003 UT App 100, ¶¶ 20–21, 68 P.3d 1052; *State v. Sykes*, 840 P.2d 825, 829 (Utah Ct. App. 1992); *State v. Hansen*, 837 P.2d 987, 989 (Utah Ct. App. 1992); *State v. Munsen*, 821 P.2d 13, 16 (Utah Ct. App. 1991).  None of these cases, however, involve an analysis of any of the exceptions to the exclusionary rule.  Rather, they seem to support a conclusion that the determination of the admissibility of evidence after an initial illegality can vary depending on the legal theory that is applied.  As we have noted, the independent source, inevitable discovery, and attenuation doctrines are often applied in factually analogous situations, but because they each focus on the facts from somewhat different legal perspectives, their results may differ.

## II. Attenuation Analysis

¶12    In the case before us, the district court applied an attenuation analysis to reach its conclusion that the evidence found in the search incident to arrest was admissible despite the unconstitutional stop that led to the discovery of the warrant.[6]  "In cases involving the admissibility of evidence obtained as a consequence of police misconduct, the United States Supreme Court has eschewed a 'but for' test" in favor of the more nuanced attenuation analysis.  *State v. Arroyo*, 796 P.2d 684, 688 (Utah 1990).

> We need not hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police.  Rather, the more apt question in such a case is whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Wong Sun*, 371 U.S. at 487–88.  Thus, application of the rule must take into account its underlying justifications:  the "exclusionary principle is driven by dual 'considerations of deterrence and of judicial integrity.'"  *State v. Grayson*, 336 S.W.3d 138, 147 (Mo. 2011) (en banc) (quoting *Brown v. Illinois*, 422 U.S. 590, 599 (1975)).  In this regard,

> [the exclusionary rule's] purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.  But [d]espite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons.

*Brown*, 422 U.S. at 599–600 (second alteration in original) (internal quotation marks omitted).  When a warrant is discovered during the course of an illegal detention, as

---

6.  The State has not argued for the evidence's admissibility under the inevitable discovery or independent source doctrines.

20100541-CA                              9

was the case here, "any analysis to determine whether the evidence seized . . . should be suppressed must involve a balancing of the mutual concerns of discouraging police conduct that results in the illegal detention of a citizen, while recognizing the legitimate interest of the state in enforcing outstanding arrest warrants." *State v. Frierson*, 926 So. 2d 1139, 1145–46 (Fla. 2006) (Anstead, J., concurring). Hence, where a warrant discovered after an initial illegality leads to the discovery of evidence of a crime, the underlying principle of the attenuation doctrine must be taken into account in determining whether that evidence ought to be suppressed: "'The notion of the "dissipation of the taint" attempts to [mark] the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost . . . [, i.e.,] to mark the point of diminishing returns of the deterrence principle.'" *McBath v. State*, 108 P.3d 241, 248–49 (Alaska Ct. App. 2005) (first alteration and omission in original) (quoting 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(a) (4th ed. 2004)).

¶13 The United States Supreme Court and the Utah Supreme Court have applied a three-part test to determine whether evidence obtained following an unconstitutional police action is sufficiently attenuated from the initial illegality to dissipate any taint. This attenuation analysis requires the court to analyze and balance three factors: "[t]he temporal proximity of the [unlawful detention] and the [search], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 603–04 (citation and footnotes omitted); *accord State v. Arroyo*, 796 P.2d at 690 n.4.

A. The District Court Applied the Correct Attenuation Test.

¶14 Strieff contends that the district court failed to properly apply this three-part attenuation analysis, instead adopting a novel intervening circumstances exception from *United States v. Green*, 111 F.3d 515 (7th Cir. 1997), that permits a district court to treat the discovery of an outstanding warrant as conclusive evidence of attenuation. The encounter in *Green* began with two police officers driving behind a blue Chevrolet that one of them recognized as having been parked the night before in front of a house belonging to a felon wanted on warrants. *See id.* at 517. The officers thought that the felon might be in the car or that, at the very least, the occupants might know where he was. *See id.* When the vehicle pulled into a driveway, the officers blocked its exit with their car, a move the Seventh Circuit later determined had resulted in the

unconstitutional seizure of both its occupants. *See id.* at 517, 520. The officers discovered a warrant for the passenger in the course of confirming his identification. *See id.* at 517. A search of the vehicle incident to the passenger's arrest yielded crack cocaine and a gun belonging to the driver. *See id.* The officers then arrested the driver. *See id.* The driver moved to suppress the evidence, asserting that it was discovered as the result of a search tainted by the illegal seizure. *See id.* The district court disagreed, and the Seventh Circuit affirmed the denial of the driver's motion to suppress. *See id.* at 517–18.

¶15    According to Strieff, while the Seventh Circuit "ostensibly appl[ied] the [attenuation] factors to the facts in *Green*," the court actually "created what it termed the 'intervening circumstances exception,'" under which the discovery of a warrant automatically attenuates an illegal seizure from evidence discovered in the search incident to arrest. Although Strieff is correct that *Green* does refer to a warrant-focused "intervening circumstances exception," *see id.* at 522–23, we do not read the decision as elevating the discovery of a warrant to a supervening circumstance that eliminates any attenuation analysis. Rather, the *Green* court considered all three prongs of the attenuation analysis and decided that, on balance, they weighed against exclusion. *See id.* at 521–23 (noting that although the illegal stop and the search were temporally proximate, the warrant constituted an intervening circumstance and the record did not reveal any bad faith on the part of the officers because, though inappropriate, "the purpose of the stop was not to seek evidence against the [occupants]" or "to search the automobile"). Its description of the rationale behind its decision to admit the evidence as an "intervening circumstance exception" therefore appears to be a form of shorthand used to describe a circumstance where the presence of a warrant tipped the balance against suppression.[7]

---

7. Some courts have employed a warrant-focused intervening circumstances exception in the manner Strieff contends that *Green* did, that is, by treating the discovery of a warrant as an independently sufficient basis to deny suppression in the face of an initial illegality. None of them relied on *Green* as a basis for such a decision, however. *See, e.g., State v. Cooper*, 579 S.E.2d 754, 758 (Ga. Ct. App. 2003) (stating, without regard for the temporal proximity or the nature of the officers' misconduct, that the officers' intervening discovery of a warrant and arrest of the defendant attenuated the link between the illegal detention and the evidence obtained); *State v. Thompson*, 438 N.W.2d

(continued...)

¶16    Indeed, the district court in the case before us did not appear to rely on *Green* as the source of a new one-step approach that treated discovery of a warrant as a per se basis for denying the motion to suppress, as Strieff claims it did.  Rather, the court employed the three-part attenuation analysis adopted by the Utah Supreme Court.  In its findings of fact, conclusions of law, and order denying Strieff's motion to dismiss, the district court identified the three factors of the attenuation analysis and then separately considered each, assessing the relevant evidence and making a determination about whether that factor weighed for or against suppression.  Although the court concluded that an arrest warrant constitutes an intervening circumstance, it did not give this factor dispositive weight.  Instead, the court, "[w]eighing the factors in their totality," determined "suppression to be an inappropriate remedy" because "Officer Fackrell did not exploit the initial unlawful detention to search [Strieff']s person."  While the district court noted that Officer Fackrell "did not cause and could not have anticipated" the arrest warrant, we do not read this statement to indicate that the court believed that the warrant was sufficient on its own to attenuate the initial illegal detention from the methamphetamine and paraphernalia discovered during the search.  Rather, it appears that the court considered the discovery of the warrant to be an intervening circumstance that did not arise as the result of purposeful or flagrant conduct by the officer and therefore provided a basis for the search that was not an exploitation of the illegal detention.  In other words, in the district court's view, Officer Fackrell did not deliberately detain Strieff in violation of his constitutional rights in the hope of turning up a warrant that would then justify a search.  Because we conclude

---

7. (...continued)
131, 137 (Neb. 1989) (determining, without considering the other two factors, that the immediate discovery of a warrant for the defendant attenuated the taint of the illegal stop and the identification of the defendant as a robbery suspect in a subsequent lineup); *cf. State v. Walker-Stokes*, 180 Ohio App. 3d 36, 2008-Ohio-6552, 903 N.E.2d 1277, at ¶ 40 ("[B]ecause as a matter of law, an outstanding arrest warrant operates to deprive its subject of the reasonable expectation of privacy the Fourth Amendment protects, the exclusionary rule does not apply to the search and seizure of that subject that would otherwise be illegal . . . ." (emphasis omitted)).  *But see State v. Gardner*, 2d District No. 24308, 2011-Ohio-5692, at ¶¶ 37–38 (explaining that the discovery of the warrant must be "removed, unrelated, unforseen, and independent from the unlawful stop and seizure" for the evidence to be admissible), *appeal allowed*, 131 Ohio St. 3d 1483 (Ohio Mar. 21, 2012).

that the district court employed the correct attenuation test, the question remaining is whether the court properly analyzed the three required factors and reached an appropriate conclusion.

B.  The District Court Carried Out an Appropriate Attenuation Analysis.

¶17    In making its decision to deny Strieff's motion to suppress, the district court analyzed each of the required factors in the attenuation analysis and properly weighed and balanced them.  We discuss each factor in turn.

   1.  Temporal Proximity

¶18    Neither party takes issue with the district court's finding that the time between Officer Fackrell's initial stop of Strieff and the search incident to arrest was "relatively short."  Close temporal proximity generally favors suppression.  *See State v. Shoulderblade*, 905 P.2d 289, 293 (Utah 1995) ("A brief time lapse between a Fourth Amendment violation and [the evidence obtained] often indicates exploitation because the effects of the misconduct have not had time to dissipate.").  However,

> [u]nlike the intervening circumstances and the purpose and flagrancy factors, . . . temporal proximity does not directly address the relationship between the police misconduct and the . . . search but rather is a circumstance surrounding these events.  As a result, its relative probative value expands and contracts depending on the particular facts of any given case.

*State v. Newland*, 2010 UT App 380, ¶ 14, 253 P.3d 71 (citation and internal quotation marks omitted).  Here, the proximity between the illegal detention and the search was short because Officer Fackrell quickly became aware of a pending warrant, placed Strieff under arrest, and searched him incident to that arrest.  The significance of that warrant as an intervening circumstance will ultimately affect how we view the relative weight of temporal proximity in this case.  Thus, while the temporal proximity factor appears to weigh in favor of suppression, its effect on the overall balance among the factors must be assessed within the broader factual context.

## 2. Intervening Circumstances

¶19    The significance of a subsequently-discovered arrest warrant in attenuating the taint of an illegal detention presents an issue of first impression in Utah.

> Case law from other state and federal courts[, however,] uniformly holds that the discovery of an outstanding arrest warrant prior to a search incident to arrest constitutes an intervening circumstance that may—and, in the absence of purposeful or flagrant police misconduct, will—attenuate the taint of the antecedent unlawful [detention].

*People v. Brendlin*, 195 P.3d 1074, 1076 (Cal. 2008) (emphasis omitted).[8]

---

8. The California Supreme Court concludes that the jurisdictions that have considered the issue have universally treated the discovery of an arrest warrant as an intervening circumstance. Our independent research supports that conclusion, as none of the cases we have located from jurisdictions that have addressed this question appear to have adopted a contrary rule. *See, e.g.*, *United States v. Gross*, 662 F.3d 393, 404 (6th Cir. 2011); *United States v. Simpson*, 439 F.3d 490, 495–96 (8th Cir. 2006); *United States v. Green*, 111 F.3d 515, 522 (7th Cir. 1997); *McBath v. State*, 108 P.3d 241, 248 (Alaska Ct. App. 2005); *State v. Hummons*, 253 P.3d 275, 278 (Ariz. 2011); *People v. Brendlin*, 195 P.3d 1074, 1080 (Cal. 2008), *cert. denied*, 129 S. Ct. 2008 (2009); *People v. Hillyard*, 589 P.2d 939, 941 (Colo. 1979) (en banc), *questioned in dicta by People v. Padgett*, 932 P.2d 810, 816 (Colo. 1997) (en banc), *discussed by People v. Martinez*, 200 P.3d 1053, 1055 n.1 (Colo. 2009) (en banc) (recognizing tension between *Hillyard* and dicta in *Padgett* but neither "address[ing] nor resolv[ing] th[at] tension"); *State v. Frierson*, 926 So. 2d 1139, 1144 (Fla. 2006), *cert. denied*, 549 U.S. 1082 (2006); *State v. Cooper*, 579 S.E.2d 754, 758 (Ga. Ct. App. 2003); *State v. Page*, 103 P.3d 454, 459–60 (Idaho 2004); *People v. Mitchell*, 824 N.E.2d 642, 649 (Ill. App. Ct. 2005); *State v. Martin*, 179 P.3d 457, 462–63 (Kan. 2008), *cert. denied*, 555 U.S. 880 (2008); *Hardy v. Commonwealth*, 149 S.W.3d 433, 436 (Ky. Ct. App. 2004); *State v. Hill*, 97-2551, p. 8–9 (La. 11/6/98); 725 So. 2d 1282, 1287; *Cox v. State*, 916 A.2d 311, 323 (Md. 2007); *People v. Reese*, 761 N.W.2d 405, 412 (Mich. Ct. App. 2008); *State v. Grayson*, 336 S.W.3d 138, 147 (Mo. 2011) (en banc); *State v. Thompson*, 438 N.W.2d 131, 137 (Neb. 1989); *State v. Shaw*, 2011 WL 2622375, *5 (N.J. Super. Ct. App. Div. 2011) (per curiam), *cert. granted*, 34 A.3d

(continued...)

¶20 To determine what role a subsequently-discovered warrant should play in an attenuation analysis under Utah law, we must first decide what constitutes an intervening circumstance. "Intervening circumstances are events that create a clean break in the chain of events" leading to the discovery of incriminating evidence. *Newland*, 2010 UT App 380, ¶ 15. "Typically, the intervening circumstance which dissipates the taint involves a voluntary act by the defendant, such as the voluntary confession or consent to search given after an illegal search or seizure." *United States v. Green*, 111 F.3d 515, 522 (7th Cir. 1997); *cf. United States v. Bailey*, 691 F.2d 1009, 1017–18 (11th Cir. 1982) ("[T]he police may legally arrest a defendant for a new, distinct crime, even if the new crime is in response to police misconduct and causally connected thereto."); *State v. Earl*, 2004 UT App 163, ¶¶ 24–25, 92 P.3d 167 (concluding that by giving a false name and birth date, the defendant committed the crime of false identification, which constituted an intervening illegal act justifying arrest). Strieff encourages us to draw from this historical pattern a proscription on treating anything other than a voluntary act by the defendant as an intervening circumstance. But the focus of concern in determining whether evidence obtained following an illegal detention ought to be suppressed is not necessarily the nature of the intervening circumstance but rather on whether there is a sufficient separation between the initial

---

8. (...continued)
783 (N.J. 2011); *State v. Soto*, 2008-NMCA-032, ¶¶ 26–27, 143 N.M. 631, 179 P.3d 1239, *cert. granted*, 143 N.M. 667 (N.M. Feb. 28, 2008) (No. 30,894), *cert. quashed*, 146 N.M. 728 (N.M. 2009); *Gardner*, 2011-Ohio-5692, at ¶ 37; *Jacobs v. State*, 2006 OK CR 4, ¶¶ 8–11, 128 P.3d 1085, 1088–89; *Reed v. State*, 809 S.W.2d 940, 947 (Tex. Ct. App. 1991); *cf. State v. Rothenberger*, 440 P.2d 184, 185–86 (Wash. 1968) (concluding that the causal link between a purportedly illegal arrest and discovery of evidence was broken by an outstanding warrant under the related independent source doctrine).

The Indiana Court of Appeals, however, has a split of authority that has not yet been reconciled, with one appellate court recognizing the discovery of a warrant as an intervening circumstance and another rejecting that approach. *Compare Quinn v. State*, 792 N.E.2d 597, 600–01 (Ind. Ct. App. 2003) (considering the warrant to be an intervening circumstance), *with Sanchez v. State*, 803 N.E.2d 215, 222–23 (Ind. Ct. App. 2004) (distinguishing *Quinn* and declining to treat the warrant as an intervening circumstance), *cert. denied*, 812 N.E.2d 804 (Ind. 2004).

illegality and the subsequent discovery of the evidence to attenuate the discovery of the evidence from the effects of the earlier police misconduct. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). Often the circumstance that intervenes is some apparently voluntary action by the person detained, but voluntariness is not a logically necessary constraint on the attenuation doctrine; rather, any event that effectively breaks the chain between the possibly coercive effects of the illegal stop on the free will of the person detained and the discovery of the evidence can serve the purpose. Because the discovery of a warrant sets in motion a legal process that can be entirely independent of the lingering effects of the illegal stop, a warrant can be such an attenuating circumstance.

¶21    "The discovery of an outstanding arrest warrant informs the law enforcement officer that a magistrate has found there is probable cause to believe that a crime has been committed and that the person subject to the warrant has committed the crime." *State v. Moralez*, 242 P.3d 223, 231 (Kan. Ct. App. 2010), *review granted* (Kan. 2011). In other words, a warrant provides cause for an arrest based on facts separate from the illegal detention and on the judgment of an official removed from the immediate circumstances. *See Reed v. State*, 809 S.W.2d 940, 947 (Tex. Ct. App. 1991); *accord Jacobs v. State*, 2006 OK CR 4, ¶ 9, 128 P.3d 1085, 1089 ("[D]iscovery of outstanding warrants is a significant intervening event which gives police probable cause to arrest a defendant independent from an illegal stop and seizure."). Indeed, the court in *United States v. Green*, 111 F.3d 515 (7th Cir. 1997), reasoned that there is "less 'taint'" when an outstanding arrest warrant intervenes than when the intervening circumstance is the defendant's voluntary act. *See id.* at 522. This is because once a warrant is discovered, there is a legal basis for a search that does not require any choice by the defendant, such as in the case of a confession or consent to search, that could be influenced by the lingering effects of the initial illegality. *See id.* And while an illegal stop might create a situation that could result in an actual crime, such as resisting arrest or disobeying a police command, for which the person detained could be legally arrested and searched, a search incident to arrest on an outstanding warrant does not stem from an act that may have been provoked by the initial illegal detention. *See id.* Put differently, when the officer does not conduct a search of the person until after the discovery of the warrant, "[t]he challenged evidence [i]s thus the fruit of the outstanding warrant, and [i]s not obtained through exploitation of the unlawful . . . stop." *See generally Brendlin*, 195 P.3d at 1080. For these reasons, we agree with the courts of other jurisdictions that a

warrant is an intervening circumstance that ought to be considered in the attenuation analysis.[9]

---

9. As Judge Thorne explains in his dissenting opinion, *see infra* ¶ 49 note 3, Utah courts have historically considered intervening circumstances involving events that occur after the initial police illegality and before the mechanism that leads to the discovery of the controverted evidence. In those cases, the evidence-producing mechanisms were volitional acts, such as a consent to search, a statement or confession, or the commission of a new crime. The dissent suggests that the warrant itself cannot be an intervening circumstance, as other jurisdictions have treated it, but rather is another type of mechanism by which evidence is discovered and is subject to taint by the initial illegality, unless there are circumstances that intervene to cleanse that taint. We believe that this criticism overlooks the function of the attenuation analysis in these circumstances.

In cases involving evidence-producing mechanisms that are volitional acts, the courts have necessarily been concerned with what circumstances might have intervened prior to the occurrence of the mechanism in order to be assured that the voluntary nature of the mechanism was not tainted by the initial illegality. Intervening circumstances, therefore, have traditionally included events that demarcate a separation between the defendant's voluntary act and any potential coercion stemming from the police misconduct, such as the passage of time (an indicator so effective in gauging the likelihood that the defendant's acts were truly the product of free will that it has taken its place as a separate factor in the attenuation analysis), a change of location, notification of the rights to remain silent or to consult an attorney, events that affect the dynamics of the relationship with law enforcement (such as an appearance before a magistrate, a release from custody, or retention of counsel), and so on. *See generally State v. Newland*, 2010 UT App 380, ¶ 15, 253 P.3d 71 (identifying some intervening circumstances).

But when the mechanism of discovery, by its nature, is not subject to the contaminating influence of unconstitutional police conduct, the taint analysis inherent in the temporal proximity and intervening circumstances factors becomes far less complicated. A warrant, for example, stands alone as a basis for an arrest and resulting search. Thus, the kind of intervening events (passage of time, notification of rights, release from custody, etc.) that are so important to assessing the validity of evidence-

(continued...)

¶22 The discovery of a warrant, however, cannot by itself dissipate the taint of an initial illegality because such a per se rule could "'create[] a new form of police investigation' by routinely illegally seizing individuals, knowing that the subsequent discovery of a warrant would provide after-the-fact justification for illegal conduct." *State v. Hummons*, 253 P.3d 275, 278 (Ariz. 2011) (alteration in original) (quoting *United States v. Gross*, 624 F.3d 309, 320–21 (6th Cir. 2010)). Thus, treating a warrant as an intervening circumstance does pose the potential for abuse, and we recognize that blanket exclusion of the evidence, the result Strieff urges us to adopt, would act as a deterrent to such conduct. The United States Supreme Court, however, has "never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." *Herring v. United States*, 129 S. Ct. 695, 700 (2009) (internal quotation marks omitted). Rather, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *See id.* at 702. We believe the purpose and flagrancy factor of the attenuation analysis ensures that courts strike an appropriate balance in warrant discovery situations between the benefits of deterrence of police misconduct and the cost to the justice system when pertinent evidence is excluded. Thus, the third attenuation factor, the "purpose and flagrancy of the official misconduct, dovetails with the [intervening circumstances] factor," and the "officers' reasons for detaining the subject and the flagrancy of the invasion on the subject's privacy" are critical to the weight to be accorded to the discovery of a warrant. *State v. Martin*, 179 P.3d 457, 463 (Kan. 2008).

---

9. (...continued)

producing mechanisms that are the product of volitional acts are not particularly relevant. Hence, virtually all the attenuation cases in other jurisdictions refer to the discovery of a warrant as itself an "intervening circumstance" (as do we), simply recognizing that it establishes a valid basis for a search incident to arrest that is inherently independent from the police illegality and therefore not subject to its taint. *See, e.g., Simpson*, 439 F.3d at 495–96; *Brendlin*, 195 P.3d at 1080. In other words, the discovery of a warrant is likely to resolve the contamination question—which is really the central focus of the first two factors in the attenuation analysis—against suppression. As we discuss next, where a valid arrest warrant is the intervening circumstance, the third factor in the attenuation analysis, purpose and flagrancy, takes on the greatest importance in determining whether suppression is appropriate.

### 3. Purpose and Flagrancy

¶23 The purpose and flagrancy of the officer's unlawful conduct that began the encounter is the factor that most "'directly relates to the deterrent value of suppression.'" *State v. Newland*, 2010 UT App 380, ¶ 17, 253 P.3d 71 (quoting *State v. Thurman*, 846 P.2d 1256, 1263 (Utah 1993)). This factor requires a court to assess whether the officer's conduct was both purposeful, that is, "'the misconduct was investigatory in design and purpose and executed in the hope that something might turn up,'" and flagrant, meaning "'the impropriety of the offic[er]'s misconduct was obvious or the offic[er] knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless.'" *See id.* ¶ 20 (quoting *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006)).

¶24 According to Strieff, the evidence demonstrates a quality of purposefulness and flagrancy in Officer Fackrell's actions that weighs in favor of excluding the methamphetamine and paraphernalia evidence. In particular, he claims that Officer Fackrell "wanted to search Strieff . . . so he illegally stopped . . . Strieff and searched for [a warrant]." Thus, he asserts, the "opportunity to discover the warrant depended entirely on the illegal detention." The district court, however, found that Officer Fackrell stopped Strieff for the legitimate purpose of investigating a suspected drug house. It further found Officer Fackrell credible when he testified that he believed that the information known to him at the time was sufficient to support a reasonable, articulable suspicion to detain Strieff, a belief that later turned out to be mistaken. Strieff has challenged the denial of the motion to suppress on the basis that the district court applied the wrong legal standard but has not challenged these fact findings, and we therefore must accept them as the district court found them. *See generally C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47, 52 (Utah Ct. App. 1995) (stating that where the party has not challenged the factual findings, appellate courts "must accept th[e] finding[s] as true"). Furthermore, when the undisputed findings of fact are sufficient to support the district court's legal conclusions, the failure to challenge the findings is usually a basis for upholding the resulting conclusions—in this case, the court's conclusion that "[t]he stop was not a flagrant violation of the Fourth Amendment[; r]ather it was a good faith mistake on the part of the officer . . . ." However, the issue of what weight to give a warrant as an intervening circumstance in the attenuation analysis presents a novel question in Utah, and the purpose and

flagrancy factor plays an integral role in that determination because it functions as an indispensable safeguard of the constitutional right to be protected from unlawful search and seizure. For these reasons, we think it worthwhile to examine the facts pertinent to the trial court's assessment of purposefulness and flagrancy in the context of applicable case law from other jurisdictions in order to clarify how the discovery of a warrant and the purpose and flagrancy factors interrelate.

¶25 While it is true, as Strieff contends, that Officer Fackrell's actions were "investigatory in nature," most detentions are, so the analysis cannot simply end there. Indeed, the purpose and flagrancy factor does not treat investigatory intent as presumptively weighing in favor of exclusion; rather, the focus is on the sort of investigation that began as or has morphed into a fishing expedition conducted in conspicuous disregard of constitutional boundaries, *see Newland*, 2010 UT App 380, ¶ 20. In other words, for the initial illegality to be deemed purposeful and flagrant, Officer Fackrell's detention of Strieff must have been "'investigatory in design and purpose and executed in the hope that something might turn up'" and "'the impropriety of the . . . misconduct [must have been] obvious or [he must have known], at the time, that his conduct was likely unconstitutional but [he] engaged in it nevertheless.'" *See id.* (quoting *Simpson*, 439 F.3d at 496); *see also* Random House, Inc., *Dictionary.com Unabridged, available at* www.dictionary.reference.com/browse/flagrant (last visited August 27, 2012) (defining "flagrant" as "shockingly noticeable or evident; obvious; glaring").

¶26 That was not the case here. In detaining Strieff, Officer Fackrell was relying on information that appeared reliable. The anonymous tip about drug activity had been corroborated to some extent by the officer's personal observations. Officer Fackrell testified that, in his experience, short-term traffic at the frequency he observed during different times of day throughout the course of a week was "enough [to] raise[] . . . suspicion" about drug activity at the house. He further testified that "everybody [he] saw visiting the house" stayed "[j]ust a couple minutes" and he assumed that Strieff was one of those short-term visitors. Although this was a questionable assumption given that he did not see Strief arrive, unreasonableness alone is not the hallmark of purpose and flagrancy. "[A]ll Fourth Amendment violations are by definition unlawful and therefore unreasonable. . . . '[U]nreasonableness itself does not suggest that [an officer's] conduct was obviously improper or flagrant or that he knew it was likely

unconstitutional.'" *Newland*, 2010 UT App 380, ¶ 20 (second and third alterations in original) (quoting *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1113 (8th Cir. 2007)). In addition, Officer Fackrell testified that he stopped Strieff so that he could further investigate what was going on inside the house. There is no indication in the record that the officer stopped Strieff with the purpose of checking for outstanding warrants, and the district court found that he did not target Strieff in knowing or obvious disregard of constitutional limitations. *Cf. People v. Mitchell*, 824 N.E.2d 642, 650, 644 (Ill. App. Ct. 2005) (affirming the suppression of drug evidence because "the sole apparent purpose of the detention [wa]s to check for a warrant" where the officer "did not think [the defendant] was involved in anything criminal"); *State v. Soto*, 2008-NMCA-032, ¶¶ 1–2, 27, 143 N.M. 631, 179 P.3d 1239 (affirming the suppression of evidence because "[t]he purpose of the stop—to obtain information from [the d]efendant—was directly related to [the d]efendant's ultimate arrest"). Rather, the facts support the district court's conclusion that Officer Fackrell "did not cause and could not have anticipated" discovery of the arrest warrant.

¶27     The court's conclusion that Officer Fackrell's conduct was neither purposeful nor flagrant is further supported by the circumstances of the encounter as a whole. The officer's misconduct amounted to a misjudgment, one of constitutional proportion certainly, but a single misstep over the constitutional boundary rather than a deliberate transgression. *See generally Rawlings v. Kentucky*, 448 U.S. 98, 110 (1990) (stating that conduct premised on an error about the officer's authority "does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion" of evidence); *People v. Brendlin*, 195 P.3d 1074, 1080 (Cal. 2008) ("[A] mere 'mistake' with respect to the . . . law[] does not establish that the . . . stop was pretextual or in bad faith."). Moreover, from Strieff's perspective, the degree of intrusion upon his rights, though real, was relatively minor. Even without reasonable, articulable suspicion, Officer Fackrell could legally have stopped Strieff and asked to see his identification, noted his name and date of birth, and then run a warrants check while Strieff remained free to leave. *See, e.g., State v. Hansen*, 2002 UT 125, ¶ 34, 63 P.3d 650 (stating that there is no Fourth Amendment seizure when an encounter is consensual, as evidenced by a person voluntarily responding to noncoercive police questioning); *State v. Deitman*, 739 P.2d 616, 618 (Utah 1984) (per curiam) (concluding that no detention occurs when an officer merely asks a defendant for identification and for an explanation of his or her activities). Had a warrant then turned up, the officer would have had a constitutional basis for

detaining Strieff as well as a professional obligation to arrest him. The situation that actually developed in this case is not so different as to suggest that the detention was either a deliberate or glaring violation of Strieff's constitutional rights or the result of official indifference to them. And, although we accept the State's concession that Strieff was not free to leave because Officer Fackrell retained his identification, we note that the furthest Officer Fackrell may have taken Strieff's identification was to the officer's nearby vehicle. Recognizing that such a minimal encroachment does not justify a Fourth Amendment violation, we nevertheless view the relatively slight intrusion as support for the district court's conclusion that Officer Fackrell was not acting purposefully or flagrantly in detaining Strieff. *See generally State v. Martin*, 179 P.3d 457, 463–64 (Kan. 2008) (taking into account all the circumstances surrounding the officers' encounter with the defendant, including the relatively minimal intrusion upon the defendant's privacy by engaging him in a brief conversation about his activities, to conclude that the officer's conduct was not purposeful). The purpose and flagrancy factor therefore weighs against suppression.

### 4. Balancing the Attenuation Factors

¶28    Finally, we address whether the district court correctly concluded that the methamphetamine and paraphernalia evidence discovered on Strieff was sufficiently attenuated from the initial illegal detention. "This balancing [test] necessitates consideration of all factors without giving any of them dispositive weight . . . [, but recognizes that t]he factors . . . are not of mathematically equal importance." *State v. Newland*, 2010 UT App 380, ¶ 26, 253 P.3d 71 (first alteration in original) (internal quotation marks omitted).

¶29    With respect to temporal proximity, we recognize that Strieff's illegal detention and the discovery of the drugs and paraphernalia in his possession occurred within a very short time period. As we have noted, however, the facts of a case affect the relative weight of the temporal proximity factor. Because temporal proximity is "a circumstance surrounding the[] events," its relative probative value contracts when the facts demonstrate that temporal proximity had little or no bearing on the subsequent conduct of the police or the defendant. *See generally id.* ¶ 14 (internal quotation marks omitted). "In routine police encounters that lead to warrants checks, there is almost always no temporal break between the initial detention and the subsequent discovery of

the evidence." *State v. Moralez*, 242 P.3d 223, 231 (Kan. Ct. App. 2010), *review granted* (Kan. 2011); *accord Brendlin*, 195 P.3d at 1079 ("[Short temporal proximity] is the typical scenario in essentially every case in this area." (internal quotation marks omitted)). And temporal proximity is less significant in the case where the intervening circumstance is discovery of a warrant because it "is not a voluntary act by the defendant" susceptible to exploitation or contamination by the recent illegality. *See United States v. Simpson*, 439 F.3d 490, 495 (8th Cir. 2006). We therefore conclude that the short time between the illegal detention and the discovery of the evidence is of relatively little weight under the circumstances of this case.

¶30 While temporal proximity has little effect on the analysis in cases involving discovery of a warrant, the intervening circumstance and purpose and flagrancy factors "dovetail" in a way that makes them mutually interdependent in the attenuation analysis. *See Martin*, 179 P.3d at 463 ("The third factor, the purpose and flagrancy of the official misconduct, dovetails with the second factor . . . ."). The Alaska Court of Appeals has distilled the relationship between the two factors in the following way:

> If, during a non-flagrant but illegal stop, the police learn the defendant's name, and the disclosure of that name leads to the discovery of an outstanding warrant for the defendant's arrest, and the execution of that warrant leads to the discovery of evidence, the existence of the arrest warrant will be deemed an independent intervening circumstance that dissipates the taint of the initial illegal stop vis-à-vis the evidence discovered as a consequence of a search incident to the execution of the arrest warrant.

*McBath v. State*, 108 P.3d 241, 248 (Alaska Ct. App. 2005). The Louisiana Supreme Court explained the relationship more directly: "Undoubtedly, had the officer[] not learned the defendant's name due to the initial stop, [he] would not have discovered the outstanding arrest warrant[]." *See State v. Hill*, 97-2551, p. 8–9 (La. 11/6/98); 725 So. 2d 1282, 1287. But, the court points out, reliance on this kind of simple "causal link . . . to suppress evidence [is] directly contrary to the dictates of the United States Supreme Court because a per se 'but for' causation test has been specifically rejected as a basis for a decision to suppress evidence." *Id.* (citing *Brown v. Illinois*, 422 U.S. 590, 603 (1975)).

In other words, not only are the "officer['s] reasons for detaining [a defendant] and the flagrancy of the invasion on . . . privacy" critical to the determination of the weight to be given to the warrant, *see Martin*, 179 P.3d at 463, so too are the means by which it was discovered, *see McBath*, 108 P.3d at 248.

¶31    A number of jurisdictions have recognized this principle.  In *Jacobs v. State*, 2006 OK CR 4, 128 P.3d 1085, the Oklahoma Court of Criminal Appeals held that such an approach "balances a defendant's right against illegal search and seizure with the community's expectation that a valid arrest warrant may be served upon a subject, even if police learned about the arrest warrant after an illegal stop." *Id.* ¶ 11.  By taking into account the officer's intent and conduct in detaining the defendant as a meaningful factor in the analysis, the "rule [effectively] discourages police from flagrantly illegal, investigatory seizures" because at some point, the gravity of the misconduct will tip the balance in favor of suppression.  *Id.*  But, "[a]t the same time, [the approach] does not attempt to punish police for mistakes or errors made in good faith[ because s]uch punishment would be unlikely to deter police misconduct."  *Id.*  The Florida Supreme Court has described the interrelationship of concerns in another way, reasoning that because a "search was incident to the outstanding warrant and not incident to the illegal stop," "[t]he illegality of the stop d[id] not affect the continuing required enforcement of the court's order that respondent be arrested" where the officer was mistaken in his justification for stopping the defendant and did not act in bad faith or under pretext.  *State v. Frierson*, 926 So. 2d 1139, 1144 (Fla. 2006).

¶32    But, "[w]here the seizure is flagrantly or knowingly unconstitutional or is otherwise undertaken as a fishing expedition, the purpose and flagrancy factor will make it unlikely that the [state] would be able to demonstrate an attenuation of the taint of the initial unlawful seizure" even when the officers discover a warrant. *People v. Brendlin*, 195 P.3d 1074, 1081 (Cal. 2008).  For example, "[i]f the purpose of an illegal stop or seizure is to discover a warrant—in essence, to discover an intervening circumstance—the fact that a warrant is actually discovered cannot validate admission of the evidence that is the fruit of the illegality." *State v. Hummons*, 253 P.3d 275, 278 (Ariz. 2011); *see also Jacobs*, 2006 OK CR 4, ¶ 11 (stating that when officers engage in "flagrantly illegal, investigatory seizures," the discovery of a warrant does not attenuate the initial illegal detention).  Such was the case in *People v. Mitchell*, 824 N.E.2d 642 (Ill. App. Ct. 2005), where the Illinois Appellate Court upheld a lower court ruling that

suppressed evidence discovered pursuant to an arrest on an outstanding warrant found during an illegal detention because when the officers encountered the defendant walking around his neighborhood at 5:00 a.m., they were not "'really looking for anyone who committed a crime,'" nor did they believe that the defendant needed help or was involved in criminal activity. *See id.* at 644. The court reasoned that the evidence was not purged of the taint of the illegal detention because "the officers stopped defendant for no apparent reason other than to run a warrant check on him," evidencing a "complete disregard of citizens' rights to be 'secure in their person.'" *Id.* at 649; *see also State v. Soto*, 2008-NMCA-032, ¶¶ 27–28, 143 N.M. 631, 179 P.3d 1239 (affirming the suppression of drug evidence where the officers "stopped [the d]efendant on the basis of nothing other than the vague notion that they would obtain [the d]efendant's personal information from him [in case any crimes were committed that night in that area], and without any further suspicion, . . . ran a warrant check on him" because the reason for the stop "was directly related to [the d]efendant's ultimate arrest").

¶33    In summary, the significance of a warrant discovered during an illegal detention depends upon the nature of the officer's intent and conduct in effecting the stop. The purpose and flagrancy factor thus acts as a mechanism to ensure that abusive police tactics are not legitimized by after-the-fact justification through the discovery of a valid warrant.

¶34    This conclusion and the analysis that leads to it to means that we must reject Strieff's argument that the remedy that most effectively deters unconstitutional police conduct while still permitting reasonable enforcement of the law is to allow a police officer to arrest a person on an outstanding warrant that is discovered during an illegal detention but to suppress any evidence seized during a search incident to that arrest. Strieff's proposal apparently arises from a statement in *United States v. Green*, 111 F.3d 515 (7th Cir. 1997), in support of treating a warrant as an intervening circumstance, that "[i]t would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant—in a sense requiring an official call of 'Olly, Olly, Oxen Free.'" *Id.* at 521. We agree with Strieff that this statement in *Green* proposes a rationale for considering the warrant as an intervening circumstance that makes little sense. It is simply unnecessary to invalidate the arrest itself in order to create a deterrence for police misconduct in effecting the

initial detention.  While deterrence would undoubtedly result, the societal cost clearly would be too high to justify such a rule.  Rather, the approach we have adopted here of treating a warrant as an intervening circumstance that, in the absence of purposefulness or flagrancy, attenuates the evidence seized from the initial illegality, is a more nuanced and satisfactory approach that provides adequate deterrence while avoiding unnecessarily heavy societal burdens.[10]

---

10.  In his dissent, our colleague articulately highlights how treating a preexisting warrant as an intervening circumstance that is free from the taint of the illegality creates the potential for abuse.  *See infra* ¶ 52 note 7.  As noted above, we share these concerns but respectfully disagree that exclusion is the only adequate remedy.  As we explained, a per se exclusionary rule in the case of a warrant seems to turn the attenuation analysis on its head because it would always exclude evidence produced by a mechanism that is not subject to contamination by the illegality of the initial encounter—a valid arrest warrant—while treating in a more nuanced way mechanisms that are clearly susceptible to such taint, such as voluntary statements or consents to search.  The dissent seems to see the more pristine status of a warrant as too much of a temptation to police, who would not have to clear the "taint" hurdle in the case of a warrant that complicates the path to admissibility of evidence produced by volitional mechanisms such as consent.

We do not dispute that the potential for abuse exists, but that potential exists in all circumstances that fall within the scope of the attenuation doctrine, which was created to more finely balance the costs and benefits of exclusion of evidence in just such complicated circumstances.  Further, we believe that district court judges are capable of applying that doctrine in a way that will appropriately constrain the incentive and potential for abuse in the case of intervening warrants, just as we have trusted them to do where the evidence is discovered as a result of a voluntary act by the defendant.  As we have explained, the purpose and flagrancy prong of the attenuation analysis is aimed directly at deterrence of illegal official conduct, and judges are aware of the potential for abuse and well positioned to scrutinize an officer's explanation of the basis of the stop and the attendant circumstances in order to make appropriate use of the exclusionary rule.  Certainly other courts have managed to effectively police the boundaries established here.  *See, e.g.*, *People v. Mitchell*, 824 N.E.2d 642, 650, 644 (Ill. App. Ct. 2005) (affirming the suppression of drug evidence because "the sole apparent

(continued...)

¶35 Moreover, we are not persuaded that there is sufficient justification for automatically separating the arrest from the evidence seized incident to that arrest under such circumstances. Rather, the general presumption is that if an arrest is lawful under the constitution, then any evidence that is discovered as a result of that arrest is admissible. *See generally United States v. Bailey*, 691 F.2d 1009, 1018 (11th Cir. 1982) (stating that even in the context of an illegal detention, the identification of a lawful reason to arrest a suspect is grounds for effecting the arrest and conducting a search incident to the arrest, the evidence of which may be used against the suspect). A rule of automatic suppression is no more desirable or necessary than a rule that automatically cleanses evidence found incident to arrest on a warrant from the taint of the initial illegality. Rather, the attenuation doctrine provides a sufficient mechanism for sorting through the circumstances so as to reach a principled conclusion as to whether suppression of evidence is appropriate under the facts of each case.

¶36 We now consider the interrelationship of the intervening circumstance and purpose and flagrancy factors in Strieff's case. The district court found that Officer Fackrell mistakenly believed he had reasonable, articulable suspicion to detain Strieff and that his discovery of the warrant was not a deliberate exploitation of the unlawful detention. The only information obtained from Strieff necessary to locate the warrant was his name and date of birth. Although this information was learned during an encounter later deemed to be illegal, it was sought as a matter of course, rather than being the purpose of the stop itself. Most importantly, the search which yielded the methamphetamine and paraphernalia evidence occurred incident to a lawful arrest required by an outstanding arrest warrant. *See generally Brendlin*, 195 P.3d at 1080 (stating that where a search is not undertaken until a warrant is discovered, the discovered "evidence was . . . the fruit of the outstanding warrant, and was not

---

10. (...continued)

purpose of the detention [wa]s to check for a warrant" where the officer "did not think [the defendant] was involved in anything criminal"); *State v. Soto*, 2008-NMCA-032, ¶¶ 27–28, 143 N.M. 631, 179 P.3d 1239 (affirming the suppression of evidence because "[t]he purpose of the stop—to obtain information from [the d]efendant—was directly related to [the d]efendant's ultimate arrest"). We believe the courts of this jurisdiction to be equally up to the task.

obtained through exploitation of the" illegality).  The discovery of the warrant and resulting discovery of the evidence thus were not the product of the officer's exploitation of the initial illegality.  *See McBath v. State*, 108 P.3d 241, 248 (Alaska Ct. App. 2005) ("If, during a non-flagrant but illegal stop, the police learn the defendant's name, and the disclosure of that name leads to the discovery of an outstanding warrant for the defendant's arrest, and the execution of that warrant leads to the discovery of evidence, the existence of the arrest warrant will be deemed an independent intervening circumstance that dissipates the taint of the initial illegal stop vis-à-vis the evidence discovered as a consequence of a search incident to the execution of the arrest warrant."); *State v. Hill*, 97-2551, p. 8–9 (La. 11/6/98); 725 So. 2d 1282, 1287 (same, citing *Brown v. Illinois*, 422 U.S. 590, 603 (1975), for the proposition that the Supreme Court has rejected a "but for" test as a basis for suppressing evidence).

¶37    Because the temporal proximity factor has relatively little weight and the other two factors weigh in favor of admitting the drug evidence discovered while conducting a search incident to Strieff's arrest, we conclude that the district court properly weighed and balanced the attenuation factors and appropriately denied Strieff's motion to suppress.


CONCLUSION

¶38    When a person is illegally detained, the discovery of a warrant is an intervening circumstance that may eliminate the taint of the initial illegality from the evidence discovered incident to the arrest on that warrant.  The significance of the warrant, however, depends upon the nature of the officer's intent and conduct in effecting the stop.  The purpose and flagrancy factor therefore acts as a mechanism to ensure that abusive police tactics are not legitimized by after-the-fact justification through the discovery of a valid warrant.

¶39    Here, the discovery of the preexisting warrant was an intervening circumstance that, coupled with the absence of purposefulness and flagrancy on the part of Officer Fackrell in detaining Strieff, sufficiently attenuated the initial illegal detention from the methamphetamine and drug paraphernalia found during the search incident to arrest

on the outstanding warrant. We therefore affirm the district court's denial of the motion to suppress.

_____
Stephen L. Roth, Judge

-----

¶40    I CONCUR:

_____
J. Frederic Voros Jr.,
Associate Presiding Judge

-----

THORNE, Judge (dissenting):

¶41    I respectfully dissent from the majority opinion. Although the majority opinion marshals an impressive body of case law from other jurisdictions in support of its analysis, I disagree with its ultimate conclusion that suppression of the evidence in this case is not necessary to deter police misconduct. I believe that this case is most appropriately analyzed under *State v. Topanotes*, 2003 UT 30, 76 P.3d 1159, a Utah Supreme Court case with remarkably similar factual underpinnings that strongly suggests that suppression is required here.

¶42    In *Topanotes*, two police officers had gone to the home of a recently-arrested prostitute to confirm her actual residence. *See id.* ¶ 2. While there, the officers encountered a woman—Topanotes—who matched a description of someone else who

allegedly lived at the house. *See id.* Although the officers had no reasonable suspicion or probable cause regarding Topanotes, they nevertheless "stopped her and asked for identification" and then "perform[ed] a warrants check as part of 'routine procedure' or 'common practice'" while retaining Topanotes's identification card. *See id.* When the warrants check revealed outstanding warrants for Topanotes, the officers arrested her, searched her incident to arrest, and discovered heroin on her person. *See id.* ¶ 3. The Utah Supreme Court ultimately held that the heroin should be suppressed despite the existence of the warrants. *See id.* ¶ 22.

¶43     I find the factual situations in the instant case and *Topanotes* to be indistinguishable for purposes of a Fourth Amendment attenuation analysis. In both cases, the defendants were on foot when they were stopped and asked for identification without reasonable suspicion or probable cause. In both cases, the police then illegally detained the individuals by retaining their identification cards while performing routine warrants checks.[1] And in both cases, the police found outstanding warrants, arrested the defendants on the warrants, searched them incident to their arrests, and found contraband in their possession.

---

1.  The majority opinion states, "Even without reasonable, articulable suspicion, Officer Fackrell could legally have stopped Strieff and asked to see his identification, noted his name and date of birth, and then run a warrants check while Strieff remained free to leave." *See supra* ¶ 27. So long as such a "stop" and request for identification was entirely voluntary on Strieff's part, I agree with the majority's statement. *See generally State v. Hansen*, 2002 UT 125, ¶ 34, 63 P.3d 650 (stating that there is no Fourth Amendment seizure when an encounter is consensual). Here, however, even if Strieff had been free to ignore Officer Fackrell's questions and request for identification, Fackrell clearly detained Strieff for Fourth Amendment purposes when he conducted a warrants check while retaining Strieff's identification card. *See generally Salt Lake City v. Ray*, 2000 UT App 55, ¶ 17, 998 P.2d 274 ("Consequently, although Ray was not seized by Officer Eldard's original request for identification, this level one encounter escalated into a level two stop when Eldard retained Ray's identification while running the warrant check. During this time a reasonable person would not have felt free to leave.").

¶44    What does distinguish *Topanotes* from this case is the specific legal doctrine at issue. In *Topanotes*, the State argued for application of the inevitable discovery doctrine, which "enables courts to look to the facts and circumstances surrounding the discovery of the tainted evidence and asks whether the police would have discovered the evidence despite the illegality." *See id.* ¶ 14. In this case, we are called upon to apply the related doctrine of attenuation, whereby evidence that is derivative of an illegal search or seizure will not be suppressed if obtained "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). These two exceptions to the exclusionary rule—along with a third exception, the independent source doctrine—are "closely related but analytically distinct." *See United States v. Terzado-Madruga*, 897 F.2d 1099, 1113 (11th Cir. 1990).

¶45    Even in light of the distinct legal doctrines involved, however, *Topanotes*'s inevitable discovery analysis remains potent authority for the "closely related" attenuation analysis at issue in the present case, *see id.*, particularly considering the nearly identical factual circumstances in the two cases. Reviewing the *Topanotes* analysis, it is clear that the supreme court made rulings that are applicable to each of the three attenuation factors employed by the majority in this case. Examining those three factors in light of *Topanotes* leads me to the inevitable conclusion that the evidence in this case should be suppressed.

¶46    As noted above, the district court in this case relied on the doctrine of attenuation to determine that the evidence against Strieff need not be suppressed notwithstanding its discovery after Strieff's illegal detention. Utah courts have adopted a three-part test to determine when attenuating circumstances will purge evidence or statements from a prior illegality by police. *See State v. Arroyo*, 796 P.2d 684, 691 n.4 (Utah 1990) (adopting "'temporal proximity of the arrest and the confession, the presence of intervening circumstances,'" and "'the purpose and flagrancy of the official misconduct'" as relevant factors in determining whether exploitation of police illegality has occurred (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)). In the context of a warrant discovered after an illegal detention, the attenuation test considers the temporal proximity of the initial illegality to the discovery of the warrant, the presence of intervening circumstances, and the purpose and flagrancy of the illegal misconduct. *Cf. State v. Newland*, 2010 UT App 380, ¶¶ 11–26, 253 P.3d 71 (applying the three-part attenuation test in the context of consent following an illegal search).

¶47    As to the first prong of this test, the majority opinion adopts the district court's finding that the time that had elapsed from Strieff's illegal detention to the discovery of the warrant and the resulting search incident to his arrest was "relatively short." Since the discovery of the warrant had actually occurred *during* Strieff's illegal detention, I would go further and characterize the warrant discovery and the illegal detention as contemporaneous. *Cf. State v. Topanotes*, 2003 UT 30, ¶ 19, 76 P.3d 1159 (stating that "the warrants check [was] performed contemporaneously with the illegal detention"). Nevertheless, the majority and I are in agreement that the first prong of the attenuation test weighs in favor of suppression.

¶48    I do, however, disagree with the majority's conclusion that the contemporaneous nature of the detention and the discovery of Strieff's warrant is "of relatively little weight under the circumstances of this case." *See supra* ¶ 29. As a purely practical matter, the contemporaneous nature of the detention and the warrant check deprived Strieff of the opportunity to leave the scene or terminate the otherwise "voluntary" encounter.[2] *Cf. id.* ¶ 20 ("We find 'most unrealistic' the assumption that Topanotes would have waited for the police to check for warrants and arrest her with heroin in her possession even if she had not been unlawfully detained."). The temporal confluence of the illegal detention and the warrants check thus played a very direct role in the discovery of the warrant and the ultimate discovery of the contraband.

¶49    As to the second attenuation factor, I acknowledge that other courts have determined that the discovery of an arrest warrant constitutes an "intervening circumstance" for purposes of an attenuation analysis. *See, e.g.*, *People v. Brendlin*, 195 P.3d 1074, 1076 (Cal. 2008). However, under Utah law, there is nothing intervening

---

2. The law surrounding level one consensual encounters assumes that a person retains the right to terminate the encounter and thereby end his or her contact with police. *See Hansen*, 2002 UT 125, ¶ 34 ("A level one citizen encounter with a law enforcement official is a consensual encounter wherein a citizen voluntarily responds to non-coercive questioning by an officer. Since the encounter is consensual, and the person is free to leave at any point, there is no seizure within the meaning of the Fourth Amendment." (citation omitted)).

about the discovery of Strieff's warrant. "Intervening circumstances are events that create a clean break in the chain of events between the misconduct and the [discovery of a warrant]." *Newland*, 2010 UT App 380, ¶ 15 (internal quotation marks omitted).[3] Officer Fackrell's discovery of Strieff's warrant was no "clean break in the chain of events," *see id.*, but rather was the natural and immediate result of Officer Fackrell illegally detaining Strieff and calling in a warrants check during that detention. Under similar circumstances, the Utah Supreme Court has intimated as much. *See Topanotes*, 2003 UT 30, ¶ 19 ("There must be *some other circumstance*, something outside the warrants check performed contemporaneously with the illegal detention, supporting inevitable discovery 'to prevent the inevitable discovery exception from swallowing the

---

3. *State v. Newland*, 2010 UT App 380, 253 P.3d 71, like many other Utah attenuation cases, arose in the context of consent to search given after an initial illegality. In my utilization of the quotation of *Newland*, I have altered the original word "consent" to reflect the circumstances of this case, the "discovery of a warrant." My choice of these words is deliberate and, I believe, appropriate, but it does have substantive implications for the intervening circumstances determination—obviously, if the "discovery of a warrant" is the event that must be preceded by intervening circumstances, then that same discovery cannot itself be the intervening circumstance that satisfies the attenuation test. However, my formulation is consistent with *Newland* and Utah's other consent cases, which do not treat the consent as an intervening circumstance between the initial illegality and the ultimate search. Rather, those cases look for circumstances intervening between the illegality and the consent itself. *See, e.g.*, *Hansen*, 2002 UT 125, ¶ 68 ("Next, we consider whether there were any intervening factors between [the] misconduct and Hansen's consent that may have mitigated the illegality. Intervening circumstances may include such events as an officer telling a person he or she has the right to refuse consent or to consult with an attorney."); *State v. Thurman*, 846 P.2d 1256, 1274 (Utah 1993) (addressing consent obtained via a form that informed the defendant of his "constitutional right not to have a search made of the premises described below without a search warrant" and his "right to refuse to such a search"); *Newland*, 2010 UT App 380, ¶ 15 (discussing the types of circumstances that can intervene "between the misconduct and the . . . consent" (omission in original) (internal quotation marks omitted)).

exclusionary rule.'" (emphasis added)).  In similar fashion, I see no intervening circumstances between the initial illegality here and the discovery of Strieff's warrant.[4]

¶50    I also conclude that the third attenuation factor—whether Officer Fackrell's illegal conduct was "purposeful or flagrant," *see State v. Newland*, 2010 UT App 380, ¶ 20, 253 P.3d 71—favors suppression in this case.  I simply cannot agree with the majority opinion that "[t]here is no indication in the record that the officer stopped Strieff with the purpose of checking for outstanding warrants."  *See supra* ¶ 26.  To the contrary, Fackrell detained Strieff by retaining his identification while Fackrell called in a warrants check.  Fackrell's intent in conducting this warrants check was, presumably, to determine if Strieff had any outstanding warrants.  *See generally State v. Sisneros*, 631 P.2d 856, 859 (Utah 1981) ("[A] person is presumed to intend the natural and probable consequences of his acts." (internal quotation marks omitted)).  Thus, regardless of Fackrell's motivation for initially approaching Strieff,[5] his detention of Strieff while conducting a warrants check was clearly purposeful behavior intended to discover the very warrant that led to Strieff's arrest and search.

---

4.  There conceivably could be instances where a warrant would not have been discovered but for some police illegality and yet the resulting arrest is attenuated by intervening circumstances.  Suppose, for example, that Officer Fackrell illegally detained Strieff for ten minutes of questioning but did not determine his identity or discover the warrant.  Then suppose that, shortly thereafter, Strieff was waiting to cross a street and was recognized by a second officer who was driving by and was aware of Strieff's warrant.  Strieff's release by Officer Fackrell and the happenstance of his subsequent encounter with the second officer would strike me as intervening circumstances between the illegal detention and the discovery of the warrant—even though, but for the illegal detention, Strieff would not have been waiting at that particular intersection when the second officer drove by and recognized him as wanted on a warrant.

5.  Officer Fackrell initially stopped Strieff because Strieff had just left a suspected drug house.  This suggests to me that Fackrell's stop of Strieff was motivated not only by a desire to learn more about the activities occurring at the house but also by a desire to investigate Strieff personally as a potential drug purchaser.

¶51 Further, "'purpose and flagrancy' [is] the most significant factor in a suppression analysis because it 'directly relates to the deterrent value of suppression.'" *Newland*, 2010 UT App 380, ¶ 17. In *Topanotes*, the supreme court determined under similar circumstances that "[a]llowing the evidence in this situation would provide no deterrent at all to future unlawful detentions." *See* 2003 UT 30, ¶ 19. The clear import of this statement, taken in context, is that suppressing the evidence *would* deter similar future police misconduct.[6] Given the direct relationship between deterrence and the purposefulness and flagrancy of police misconduct, the supreme court's holding that suppression would serve a deterrent purpose under these circumstances seems to me to be an implicit recognition that this type of police misconduct is purposeful or flagrant for purposes of an attenuation analysis and is therefore a proper subject for deterrence. *See generally State v. Thurman*, 846 P.2d 1256, 1263–64 ("[I]f the police had no 'purpose' in engaging in the misconduct . . . suppression would have no deterrent value.").

¶52 The majority opinion does reflect a great effort to draw some line protecting the public from purposeful or flagrant police abuse of warrants checks, and I applaud that effort. However, I cannot agree with the majority's conclusion that whether suppression is appropriate in any given circumstance "depends upon the nature of the officer's intent and conduct in effecting the stop." *See supra* ¶ 33.[7] Warrants do not reveal themselves, and they are generally only discovered when the police affirmatively look for them. When such an intentional warrants check takes place during an illegal detention, it is inevitably the case, at least in my opinion, that the detention has been purposefully exploited to discover the warrant and that evidence discovered in a

---

6. I note that the warrants check in *Topanotes* was conducted "as part of 'routine procedure' or 'common practice.'" *See State v. Topanotes*, 2003 UT 30, ¶ 2, 76 P.3d 1159.

7. Indeed, such a standard seems to me to practically invite police officers to routinely make illegal stops and warrants checks so long as some other reason for the stop can be articulated. Under the majority's rule, the articulated reason need not satisfy the Fourth Amendment's requirements for a legal stop but must only establish some reason for the stop other than a bare desire to check for warrants. The ease with which this standard could be satisfied by all but the most unimaginative police officers would, as a practical matter, provide an incentive for police officers to make illegal stops and warrants checks as a matter of routine.

contemporaneous search incident to arrest on the warrant should be suppressed to deter such a practice.

¶53    In sum, I would conclude that all three of the attenuation factors weigh in favor of suppression in this case and I would reverse the district court and suppress the evidence found during the search incident to Strieff's arrest.  I reach this conclusion in the face of the many warrant-discovery cases from other jurisdictions, as cited in the majority opinion, that have decided to the contrary—not to mention the carefully constructed analysis of the majority opinion itself.  Nevertheless, I just cannot get around the fact that the evidence in this case was discovered as a direct result of police misconduct and that, without suppression, there will be no deterrence of similar misconduct in future encounters between pedestrians and police.

¶54    Ultimately, I agree with the majority that the attenuation analysis in these circumstances involves a "balancing of the mutual concerns of discouraging police conduct that results in the illegal detention of a citizen, while recognizing the legitimate interest of the [S]tate in enforcing outstanding arrest warrants."  *See State v. Frierson*, 926 So. 2d 1139, 1145–46 (Fla. 2006) (Anstead, J., concurring).  However, the State's primary and laudable interest in enforcing arrest warrants is to get those persons named therein into custody to answer for the charges underlying the warrants.[8]  As to this primary interest, I see little room for balancing.  Whenever an arrest warrant is discovered—however it is discovered—it is proper for police to arrest the person named in the warrant.  *See, e.g., United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997) ("It would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant—in a sense requiring an official call of 'Olly, Olly, Oxen Free.'").

¶55    Many courts seem to end the attenuation analysis there, reasoning that because searches are allowed incident to arrest, then a valid arrest necessarily means a valid search.  *See, e.g., id.* ("Because the arrest is lawful, a search incident to the arrest is also lawful.").  However, I am completely comfortable with decoupling the validity of the arrest from the admissibility of the resulting evidence for purposes of the Fourth

---

8.  By contrast, searches incident to arrest are just that—incidental.

Amendment analysis.[9] To me, the only question is whether suppression will reach back past the warrant to deter the police illegality that led to the warrant's discovery. In the instant case, suppression would give police an incentive to ensure that they have adequate grounds to stop citizens on the street and would ultimately deter similar illegal detentions. Under these circumstances, I have little trouble in concluding that the balancing of interests shifts squarely in favor of suppression of the evidence,[10] while leaving the validity of the arrest based upon the warrant untouched.

¶56 In any event, I remain convinced that, for purposes of Utah law, my evaluation of the attenuation factors is supported by *State v. Topanotes*, 2003 UT 30, 76 P.3d 1159. I simply cannot read that case and surmise that the Utah Supreme Court would have allowed the evidence discovered in these circumstances if only the State had urged the attenuation doctrine instead of the "closely related" inevitable discovery doctrine. *See United States v. Terzado-Madruga*, 897 F.2d 1099, 1113 (11th Cir. 1990). Unless and until the Utah Supreme Court revisits *Topanotes*, the nearly identical factual situations between that case and this one suggest that *Topanotes* is extremely persuasive, if not binding, authority on the suppression issue in this case. Accordingly, I must dissent

---

9. In a sense, this situation is analogous to a double hearsay problem where an exception cures one instance of hearsay but not the other. *Cf. State v. Schreuder*, 726 P.2d 1215, 1231 n.1 (Utah 1986) ("[D]ouble hearsay is admissible if both aspects qualify under an exception to the hearsay rule . . . ." (Stewart, J., concurring in result)). Officer Fackrell could neither detain Strieff without reasonable suspicion nor arrest him without probable cause. The warrant cures any probable cause problem, but we are left with the illegal detention. As with double hearsay, I would not allow the evidence unless both impediments to admissibility are removed.

10. I note that certain types of evidence—e.g., a defendant's DNA, scars, or tattoos—are permanent enough in nature that they could reasonably be expected to be discovered whenever the defendant would eventually be arrested on a warrant. Such evidence is therefore not the sole product of the illegal discovery of the warrant at a particular time and place because it would inevitably be discovered whenever the warrant was executed. Accordingly, I would likely not suppress such evidence, even when a defendant is arrested on a warrant discovered through an illegal detention. The drug evidence at issue in this case is not this type of evidence.

from the majority opinion, and I would reverse the district court's suppression ruling and Strieff's convictions below.



_____

William A. Thorne Jr., Judge